# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DIANE M. CHARETTE,                  )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )     Docket no. 1:17-cv-35-GZS
                                    )
ST. JOHN VALLEY SOIL AND WATER      )
CONSERVATION DISTRICT, et al.,      )
                                    )
                                    )
                    Defendants.     )

## ORDER ON PLAINTIFF'S MOTION TO AMEND COMPLAINT AND DEFENDANTS' MOTIONS TO DISMISS

Before the Court is the Motion to Dismiss filed by Defendant David Potter (ECF No. 11) and the Motion to Dismiss filed by Defendants St. John Valley Soil and Water Conservation District, the State of Maine Department of Agriculture, Conservation and Forestry, Duane Theriault, and Kurt Coulombe (ECF No. 12) (collectively, "Defendants' Motions to Dismiss"). The Court also has before it Plaintiff's Motion to Amend Complaint (ECF No. 19). After considering the parties' filings, and for the reasons explained below, the Court GRANTS Plaintiff's Motion to Amend and GRANTS IN PART AND DENIES IN PART Defendants' Motions to Dismiss.

## I.  MOTION TO AMEND COMPLAINT

When a party has already amended its pleading once as a matter of course,[1] "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R.

---

[1] Plaintiff previously amended her Complaint to correct an error in the caption.  (See ECF No. 8.)

Civ. P. 15(a)(2).  However, "[t]he court should freely give leave when justice so requires."  Id.

In general,

> In the absence of any apparent or declared reason—
> such as undue delay, bad faith or dilatory motive on the part of the movant, repeated
> failure to cure deficiencies by amendments previously allowed, undue prejudice to
> the opposing party by virtue of allowance of the amendment, futility of amendment,
> etc.—the leave sought should, as the rules require, be 'freely given.'  Of course, the
> grant or denial of an opportunity to amend is within the discretion of the District
> Court . . . .

United States ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 10 (1st Cir. 2016) (quoting

Foman v. Davis, 371 U.S. 178, 182 (1962)).

The Court discerns no reason to deny Plaintiff's current request to amend her complaint.

See United States ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d at 10.  Defendants contend that

further amendment of the complaint will be futile because even with the proposed amendments

the complaint fails to state a claim.  However, in its discretion, the Court determines that it is

appropriate and in the best interest of judicial economy to accept the Second Amended Complaint

as the operative pleading and to determine whether Plaintiff has failed to state a claim accordingly,

especially considering that the analysis for futility of a proposed amendment is the same as the

general analysis on a motion to dismiss.  See Adorno v. Crowley Towing and Transp. Co., 443

F.3d 122, 126 (1st Cir. 2006) ("In assessing futility, the district court must apply the standard

which applies to motions to dismiss under Fed. R. Civ. P. 12(b)(6).")  The Court notes that

Defendants will not be unduly prejudiced by this approach as the amendments do not substantively

change the nature of the claims and Defendants have addressed the legal significance of the

amendments in their responsive briefs to Plaintiff's Motion to Amend.  The Court therefore

GRANTS Plaintiff's Motion to Amend and proceeds to consider the pending Motions to Dismiss

with the Second Amended Complaint as the operative pleading.

## II. MOTIONS TO DISMISS

### A. Legal Standard

The Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought." Fed. R. Civ. P. 8(a)(1)-(3). The Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Under Rule 12(b)(6), the Court "may consider only facts and documents that are part of or incorporated into the complaint." United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 39 (1st Cir. 2011) (quotation marks omitted).

A viable complaint need not proffer "heightened fact pleading of specifics," but in order to survive a motion to dismiss it must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). At this point in the litigation, "the determination of whether an issue is trialworthy simply is not the same as the determination of whether a plaintiff states a claim upon which relief can be granted." Bodman v. Maine, Dep't of Health and Human Servs., 720 F. Supp. 2d 115, 121 (D. Me. 2010).

However, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (stating that a court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). In short,

a plaintiff must plead facts indicating "more than a sheer possibility that a defendant has acted unlawfully."  Id.

### B.  Factual Background

Plaintiff Diane M. Charette was hired on August 26, 2014, to work as the District Coordinator for the St. John Valley Soil and Water Conservation District ("the District"), an agency of the State of Maine.  At all material times, the District was governed by a board of five "supervisors" consisting of Defendant David Potter, Chairman; Defendant Duane Theriault, Co-Chairman; Defendant Kurt Coulombe, Treasurer; John "Gene" Desjardins; and Peter Smith. Thomas Schneck was an "associate supervisor."  By statute, Defendant Maine Department of Agriculture, Conservation and Forestry ("the Department") exercises some oversight and coordination authority over the various state soil and water conservation districts, including the District.  Three of the District supervisors are elected and two are appointed by the Department. Approximately two-thirds of the District budget is controlled by the Department.  In addition, the Department operates the first election of the supervisors it does not appoint, has promulgated rules governing the elections, and issues oaths of office and certificates of election to the supervisors. David Rocque oversees the soil and water conservation districts on behalf of the Department. During her time as District Coordinator, Charette worked out of an office shared with the United States Natural Resources Conservation Service ("NRCS") in exchange for her performing services for them and the NRCS paid some portion of her wages.

In November of 2014, Potter told Charette that she "will not have [her] way with" him and that he would not let her have her way even if she "were to dance naked on the desk."  (Second Amended Complaint ("Compl.") (ECF No. 19-1) ¶ 32.)  Potter was very stern and angry when he

made this comment, and Charette found it to be highly offensive. Prior to a November 12, 2014, supervisors' board meeting, Potter asked Charette to find out how the District could purchase heavy equipment through a State of Maine program that sold reduced-price equipment to public entities. Private individuals and for-profit companies were ineligible to participate in the program. Potter asked Charette to find a list of equipment that was available for purchase and to determine how long the District would have to hold on to the equipment before it could be resold. At that time, the District did not have any projects planned or underway to use heavy equipment. Both Potter and Theriault owned private, for-profit businesses that used heavy equipment. Charette subsequently shared information about the purchase price for heavy equipment pursuant to the program with Potter. At the November 12th meeting, Potter stated that the District could make money by purchasing heavy equipment through the program, holding it for eighteen months, and then selling the equipment to the District supervisors. Theriault commented that he could use a dump truck. Desjardins said that the District needed a reason to purchase the equipment for its own use rather than buying it so that the supervisors could profit by purchasing it afterwards. He said that this practice had been conducted before and the people involved were told to cease the practice immediately. In response, Potter said, "then we'll do it until they tell us to stop." (Compl. ¶ 48.) Charette then stated that she would not do anything illegal. She was concerned that Potter was proposing to misuse government funds for personal gain. Potter became agitated and said to her, "I suppose now you're going to start telling me how to do my job." (Compl. ¶ 51.) In response, Charette stated, "No, I'm just going to say how I'm going to do my job." (Compl. ¶ 52.) Charette could sense lots of anger coming from Potter and she was frightened.

The day after the board meeting, Potter came to Charette's office, said he could not find the resignation letter from a previous District Coordinator, and angrily accused Charette of taking

the personnel files of previous District employees.  When Charette told him that she had not taken the files, Potter had an outburst and reacted as if she were lying to him.  Potter later found the resignation letter at home, but he never apologized for blaming Charette.

Later that week, Desjardins called Charette to ask how things were going with her job. Charette informed him about how Potter had acted towards her and that she was afraid of him. Smith and Schneck both also contacted Charette and she informed them of her concerns about Potter.  Theriault also came into the office, at which time an NRCS employee who shared the office with Charette informed Theriault of how Potter had been acting towards her.  Potter learned about Charette's complaints about him shortly after she made them.  Generally, although Potter had been stern with Charette since the beginning of her employment, he became more hostile towards her after she complained about his conduct.  The week of November 17, 2014, Charette tried to contact Potter by phone and by email in order for him to come to the office to sign her payroll check, but he did not respond.  Previously, Potter had always been willing to sign Charette's check.  Because Potter would not respond, Charette took the check to Coulombe's house for his signature.  At that time, Charette informed Coulombe about her interactions with and fear of Potter.

On December 18, 2014, Rocque called Charette and informed her that he could come to a board meeting at any time to discuss any issues she was having.  Rocque told Charette that another NRCS employee had contacted him because the employee was very concerned about the way Potter was treating Charette.  Charette subsequently checked with Coulombe about Rocque attending a board meeting.  Coulombe asked for Rocque's phone number and requested that Charette keep the issue between her and Coulombe.  That same day, in relation to Charette's request a week earlier for an upgrade to a newer version of Microsoft Word, which request had

been supported by Schneck, Potter wrote to Schneck: "I agree that we should upgrade the software on our laptop next year.  But, I see no reason why the work can't be done now on the NRCS computer.  It['s] right there in front of her.  What am I missing?"  (Compl. ¶ 65.)

On December 29, 2014, Potter angrily confronted Charette about working from home on snow days.  Charette explained that she had only worked from home on two days during snow storms, and that she had not been told previously that she could not do so.  Potter responded that the issue would be addressed with the board.  Charette was very uncomfortable during this discussion because she could feel that Potter was very angry at her.  The next day, Potter circulated a memo to the other supervisors via email criticizing Charette for working from home and reminding her that "[a]s a new employee, you are still within the six month probationary period." (Ex. A to Compl. (ECF No. 19-2), Page ID # 237.)  After Charette responded by email expressing surprise at Potter's memo, Potter circulated another email stating, in part, that he thought it was "very bad judgment" on her part to work at home without first seeking permission and that she "will need to verify that the [NRCS] office was closed by [an NRCS employee] for 'snow days' on the days you worked from home."  (Ex. C to Compl. (ECF No. 19-4), Page ID # 239.)  Potter later emailed the NRCS employee asking how many days the office had been closed due to bad weather.[2]

On January 6, 2015, Potter emailed Charette and copied the other supervisors accusing Charette of falsely stating to an outside contact that Potter had been forwarding emails to her personal email address.  On January 7, 2015, Potter approached Charette at her desk, asked where the applicants' files were for Charette's position, and sternly warned her not to throw them away because she was still on probation.  At some point subsequent to these interactions, Charette's

---

[2] The Court notes that Exhibit D to the original Complaint, which is the email from Potter to the NRCS employee, is not attached to the Second Amended Complaint.

doctor recommended that she no longer have any contact with Potter at all because of the high levels of stress and anxiety their interactions caused her.

On January 14, 2015, Charette attended a board meeting with her lawyer to express concerns about Potter's behavior. Although Potter and Theriault did not want to let Charette's lawyer address them, they reluctantly agreed to let him make a brief statement, which he did, expressing that Charette had been subjected to sexual harassment and a hostile work environment by Potter. Charette's lawyer provided the board with a letter—"RE: Representation Notice for Diane Charette/Allegations of Harassment and Sexual Harassment"—stating that he was considering filing a complaint with the Maine Human Rights Commission "against the District and individually against [Potter]." (Ex. F to Compl. (ECF No. 19-6), Page ID # 242.) Charette's lawyer also provided the board with a "Grievance Report" by Charette, a written summary of the incidents between Charette and Potter previously described. During the meeting that followed the lawyer's presentation, Potter stated at least twelve times that Charette was a probationary employee and suggested changes to the personnel policy that adversely impacted her, such as changes addressing administrative leave and snow days.[3] Also discussed during the meeting was Charette's authority to sign the contribution agreement between the District and the NRCS. The agreement allowed the District to occupy the NRCS office in exchange for Charette's performing services for the NRCS. Prior to the meeting, Charette was told that she was going to be given the authority to sign the agreement, but Potter deleted her name from the list of people with that authority during the meeting. Coulombe and Theriault agreed with this action. The supervisors also discussed that Charette would be required to give them the passwords for her computer so that they could access the computer whenever they wanted. Finally, during the same meeting, Potter

---

[3] It is unclear from the Complaint and attachments whether these changes were actually made.

and Theriault refused to allow Charette to go to Bar Harbor to pick up her Government LincPass and to attend an erosion control workshop on February 2, 2015, as she had planned. Potter said it was too early in her employment to allow this and that there was not enough trust yet. The LincPass was required for Charette to continue to work in the NRCS office space and to use the NRCS equipment and access NRCS files, both of which were required for her to fulfill her responsibilities to the NRCS. Coulombe later refused to sign the NRCS contribution agreement that Charette had worked on extensively, stating, "because of this situation I no longer want to do this." (Compl. ¶ 85.) Previously, Coulombe had signed agreements without incident. Charette emailed Potter to sign the agreement, and she left it for him on her desk. Charette later learned that Potter had not signed the agreement, which put Charette's job in jeopardy.[4]

On January 15, 2015, Charette's husband took her to the emergency room because Charette thought she was having a heart attack. On January 16, 2015, Charette's primary care provider diagnosed her with anxiety disorder due to her reaction to her working environment. The doctor started Charette on anti-anxiety medication and removed her from work, initially for two weeks. The doctor eventually kept Charette out of work until the end of her employment with the District. As a result of her treatment at work, Charette alleges that she developed mental or psychological disorders, including anxiety disorder, depression, and severe panic attacks. These impairments had a duration of more than six months, impaired her health to a significant extent as compared to what is ordinarily experienced in the general population, and substantially limited one or more of her major life activities. Charette filed a Workers' Compensation claim for mental injury caused by mental stress, which was approved. At some point after Charette went out of work, Potter

---

[4] The Court infers that Charette is alleging her job was in jeopardy because the agreement allowed her to share the NRCS office and to receive part of her salary in exchange for performing some services for them.

picked up her paycheck from the accountant's office, and it was withheld from Charette for four weeks even though she made several attempts to receive it.

Following the January 14th board meeting, Desjardins and Smith wrote to Rocque expressing concern about recent events in the District. They stated, "Since very early in her working for the District, Mrs. Charette shared complaints with both of us and other members concerning statements and conduct by David Potter towards her." (Ex. H to Compl. (ECF No. 19-8), Page ID # 246.) They further explained that Charette had formally advised the board of her "harassment allegations" at their last meeting. Id. They specifically asked Rocque to attend an upcoming meeting at which the board would discuss the allegations in detail "for guidance and oversight" because they "fear[ed] Mrs. Charette will not be treated fairly." Id. Finally, they informed Rocque that there had been "discussion about obtaining State surplus property so that it may be made available to our region's individuals," asked whether this was "appropriate," and further inquired whether property not used for a period of time could be available for purchase by the supervisors. Id. During this period, Charette's lawyer also separately wrote to Rocque, at the behest of Desjardins, explaining her allegations that Potter's behavior towards her had created a hostile work environment. (See Ex. I to Compl. (ECF No. 19-9), Page ID # 247.)

On January 22, 2015, Charette and her lawyer attended a special board meeting that they understood would address her allegations. Instead, the board went into a special meeting, and Charette and her lawyer were not allowed to participate. In February of 2015, Charette was interviewed by an outside lawyer hired by the District to investigate her allegations.

On May 7, 2015, the District's lawyer wrote to Charette's lawyer offering, on a three-month temporary basis, to return Charette to work under a different supervisor than the Chair,

Potter, which required a change to the personnel policy.[5]  Pursuant to this offer, Potter would remain Chair of the board, be present at board meetings, and remain involved in other official business, but Charette would be directly supervised by Smith.  With these conditions, Charette believed that she was still medically unable to return to work.  On May 26, 2015, Rocque sent an email to the District supervisors that he wanted to schedule a meeting for June 2, which would include Charette, and the topic of which would be "board functionality."  (Compl. ¶ 104.)  In response, Potter emailed the supervisors, the District's lawyer, and the NRCS employee in the shared office to state his concern, inter alia, that the board was taking the wrong approach with Charette and that the meeting would "likely amount to a set up by my enemies." (Ex. K. to Compl. (ECF No. 19-11), Page ID # 250.)  At the June 2nd meeting, which Charette and her lawyer attended, her complaints were not addressed.  Theriault stated during the meeting that he never wanted Charette in the District Coordinator position.

Sometime in June, Rocque left Charette phone messages indicating that, if she did not return to work prior to the end of June, the District would not receive certain funds.  On June 3, 2015, Charette's lawyer wrote to the District's lawyer expressing concern about the way the June 2nd meeting was handled and the way Charette was being treated; requesting that Charette's job duties and the personnel policies revert back to how they were before she went out of work; and requesting that she be informed of the results of the outside lawyer's investigation.  On June 26, 2015, the District's lawyer responded in a letter to Charette's new lawyer, reiterating the offer to change Charette's immediate supervisor on a trial basis and stating that Charette would not be

---

[5] Charette alleges, "Prior to that letter and after Plaintiff went out of work in January 2015, nobody at the District had approached Plaintiff to address her complaints or attempt to find a solution to return Plaintiff to work."  (Second Amended Complaint ("Compl."), ¶ 102.)  The Court notes that this is potentially somewhat contradicted by the mention in the letter of a telephone conversation on April 30, 2015.  (See Ex. J to Compl. (ECF No. 19-10), Page ID # 249.)

provided with a copy of the outside investigator's report. On July 14, 2015, Charette's lawyer responded by letter that Charette had a mental disability that prevented her from having contact with Potter, and, for that reason, that she was asking for a reasonable accommodation that she not have contact with him after she returned to work. Charette's lawyer stated that Charette was medically unable to return to work under the arrangement proposed by the District. He further stated that he needed some assurance that Charette's complaints were being taken seriously, that appropriate discipline was imposed, and that further harassment would not occur. He also requested that he be sent a copy of the current personnel policy and the date of any revisions in order to identify what policies Charette would like to revert back. (See Ex. N to Compl. (ECF No. 19-14), Page ID # 255.)[6] On July 24, 2015, the topic "State Surplus" appeared on the District board meeting agenda.

On August 3, 2015, the District's lawyer responded to Charette's lawyer, indicating that Potter had recused himself from any matters relating to Charette's status; requesting that Charette's doctor complete a form to support her reasonable accommodation request; and enclosing a copy of the motions that were passed at an executive session of the board on April 29, 2015, including an amendment to the personnel policy to allow someone other than the Chair to directly supervise the District Coordinator. (See Ex. O to Compl. (ECF No. 19-15), Page ID # 257-58.) On August 25, 2015, Charette's lawyer emailed a completed reasonable accommodation request form to the District's lawyer, which clarified that Charette should not have any involvement with Potter.

On October 21, 2015, the District's lawyer wrote to Charette's lawyer proposing a return to work plan pursuant to which, on a two-month trial basis, Charette would return to her position

---

[6] In the letter, Charette's lawyer mentions "May 2014 revisions," which would have been adopted before Charette was hired by the District in August of 2014. (Ex. N to Compl. (ECF No. 19-14), Page ID # 255.) The Court takes this to mean that Charette's lawyer was requesting a copy of the personnel policy as it existed at the time Charette was hired and before any revisions targeted at her may have been made.

with Smith as her supervisor and would be excused from attending board meetings, but would only work 20 hours per week (as opposed to 32), with a second employee working the rest of the week, attending board meetings, and handling all communications with Potter.  (See Ex. Q to Compl. (ECF No. 19-17), Page ID # 265.)  For the complementary position, the District identified the man who had been filling in for Charette beginning at some point after she went out of work in January of 2015.  See id.  On October 30, 2015, Charette's lawyer responded expressing Charette's concerns about a reduction in hours and the shared position, and requesting that she continue as the sole District Coordinator with the same number of hours.  Charette's lawyer proposed that, to avoid interactions with Potter, Charette could meet with Smith each month prior to the scheduled board meetings and he could relay any necessary information between Charette and the board.  Charette's lawyer also again requested that he be provided with a copy of the current personnel policy so that Charette could review it before returning to work.  (See Ex. R to Compl. (ECF No. 19-18), Page ID # 266.)

On November 23, 2015, the District's lawyer responded by reiterating that the board would like to proceed with their proposed return to work plan and rejecting Charette's counteroffer because "[t]he District considers attendance at Board meetings and communication with the Board Chair to be essential job functions which would not be required to be eliminated as a reasonable accommodation."  (Ex. S to Compl. (ECF No. 19-19), Page ID # 267.)  The District's lawyer also attached the current personnel policy and noted again that the policy had been amended on April 29, 2015, to allow Smith's supervision of Charette.[7]

On December 8, 2015, Charette sent a letter to the supervisors officially resigning her position and stating, in part:

---

[7] It appears that this attachment is not included with the Second Amended Complaint.

After careful review of the job offer and the documents attached with that offer, I am aware that the issues I had discussed during the investigation for harassment have not been addressed nor resolved. These unaddressed and unresolved issues leave me feeling it is unsafe for me to return to work.

Due to the physical and emotional distress caused by this ongoing issue, I find myself forced to submit my resignation at this time to preserve my well-being and quality of life. . . . I am sorry to have to leave such a wonderful position, but I am no longer able to endure the ongoing stress caused by the unresolved issues that continue to exist at the District.

(Ex. T to Compl. (ECF No. 19-20), Page ID # 268.) Shortly after her resignation, the District hired the man who had been filling in for Charette as her permanent replacement. According to Charette, Potter, Theriault, and Coulombe have treated her replacement courteously throughout his employment without similar treatment as she experienced.[8]

## C. Discussion

As a preliminary matter, the Court notes that "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones" and "the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Plaintiff has set out multiple theories to support each count in her Complaint, and the Court declines to dismiss a count if any of the individual theories are sufficient to state a claim to relief. Once the Court determines that a count is adequately pleaded to survive a motion to dismiss, the Court will not separately analyze each individual theory if the scope of discovery will not be significantly affected by doing so.[9] See Elena v. Municipality of San Juan, 677 F.3d 1, 8 (1st Cir. 2012) ("The municipal

---

[8] Defendants do not appear to contest that Charette has administratively exhausted her claims.

[9] Courts that have critiqued this approach have focused on the discovery burden on defendants from having to prepare to defend several theories of liability. See, e.g., Taylor v. J. C. Penney Co., Inc., No. 16-cv-11797, 2017 WL 1908786, at *3 n.1 (E.D. Mich. May 10, 2017) ("A court should consider the viability of a particular theory, even if the entirety of the claim will not be dismissed, because allowable discovery tracks the claims as pled. If a defendant cannot seek prompt exclusion of a legally non-viable theory, then extensive discovery might have to be undertaken on an invalid theory until that theory could be rejected at the summary judgment stage. Such an approach would waste litigant

defendants . . . argue that the complaint is insufficient because the plaintiffs pled in the alternative that they had either a direct interest in the tree or else an interest in the shade and security it provided.  But the rules are clear that alternative pleadings are proper, and the plaintiffs appear to have presented at least one set of facts sufficient to support a plausible property interest in the tree that forms the centerpiece of this litigation.") (internal citation and footnote omitted); see also BBL, Inc. v. City of Angola, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."); Croixland Properties Ltd. P'ship v. Corcoran, 174 F.3d 213, 218 (D.C. Cir. 1999) ("Under Federal Rule of Civil Procedure 8[(d)(2)], a complaint may contain alternative theories, and if one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint.") (footnote omitted).

### 1. MHRA claim against the District (Count I)

In Count I, Plaintiff alleges that the District is liable under the Maine Human Rights Act ("MHRA") because she was (1) subjected to adverse employment actions because of her sex and because she engaged in activity protected by the Maine Whistleblowers' Protection Act ("MWPA"); (2) subjected to materially adverse actions because she opposed practices that would be a violation of the MHRA and asserted her rights under the Act; (3) subjected to a hostile work environment because of her sex and because she engaged in protected activity under the MWPA and the MHRA; (4) constructively discharged because of her sex, her disability, and because she engaged in activity protected under the MWPA and the MHRA; and because the District (5) failed

---

resources.")  The Court concludes, however, that the scope of discovery in this matter will not be significantly affected by parsing out each individual theory in Plaintiff's Complaint at this stage.

to engage, in good faith, in an informal, interactive process with her to determine the appropriate reasonable accommodation for her disability and (6) failed to provide her with a reasonable accommodation. (Compl. ¶¶ 132-38.) The Court determines that Plaintiff has stated a plausible claim based on the MHRA as to the District.

The MHRA makes it unlawful on the basis of sex or whistleblowing activity, among other bases, "to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment . . . ." 5 M.R.S.A. § 4572(1)(A). Under the MWPA, no employer may discriminate against an employee based, among other things, on oral or written reports made in good faith by that employee to the employer of what the employee reasonably believes to be illegal conduct or based on an employee's refusal to engage in illegal conduct. 26 M.R.S.A. § 833(1).[10] Further, the MHRA makes it unlawful "to discriminate in any manner against individuals because they have opposed a practice that would be a violation of this Act." 5 M.R.S.A. § 4572(1)(E). To state a claim for relief under the MHRA on these bases, a complaint must plausibly allege that the plaintiff experienced an "adverse employment action" on the basis of her sex, or her whistleblowing or oppositional activity. See, e.g., Bodman v. Maine, Dep't of Health and Human Servs., 787 F. Supp. 2d 89, 109 (D. Me. 2011) (discrimination based on MWPA activity); Morales-Cruz v. Univ. of Puerto Rico, 676 F.3d 220, 224 (1st Cir. 2012) (discrimination based on sex).[11] To survive a motion to dismiss, "[a]ll the plaintiff is required to show . . . is

---

[10] "Although the MWPA provides no private right of action, plaintiffs may file a civil action [for violation of the MWPA] under the MHRA." Osher v. Univ. of Me. Sys., 703 F. Supp. 2d 51, 64 n.13 (D. Me. 2010).

[11] "Because the relevant provisions of the Maine Human Rights Act . . . are similar to Title VII of the Civil Rights Act of 1964 . . . Maine courts look to Title VII case law in construing the MHRA." Gavrilovic v. Worldwide Language Res., Inc., 441 F. Supp. 2d 163, 177 (D. Me. 2006).

evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." Chadwick v. Wellpoint, Inc., 493 F. Supp. 2d 141, 143 (D. Me. 2007) (alteration in original) (quotation marks omitted). "An employee has suffered an adverse employment action when the employee has been deprived of something of consequence as a result of a demotion in responsibility, a pay reduction, or termination, *or the employer has withheld an accouterment of the employment relationship*, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service." LePage v. Bath Iron Works Corp., 909 A.2d 629, 636 (Me. 2006) (alteration in original) (emphasis added) (quotation marks omitted); see also Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) ("The test for whether an employment action is adverse is whether it materially change[s] the conditions of plaintiffs' employ.") (alteration in original) (quotation marks omitted).

In this case, Plaintiff has stated a plausible claim that she was discriminated against in her employment based on her sex, her conduct in complaining of sexual harassment, and her conduct in speaking against the proposed plan to buy surplus equipment for resale to some board supervisors. On the present record, the Court specifically determines, contrary to Defendants' contention, that Plaintiff has adequately pleaded that she was subject to adverse employment actions, which may include, but are not limited to, the withholding of her paycheck and the changing of personnel policy to impact her job. Further, Plaintiff has alleged that she was at least implicitly threatened with termination, by Defendant Potter in particular, and threats to terminate a plaintiff based on whistleblowing activity are actionable. See LePage, 909 A.2d at 636-37.

Defendants cite cases in which courts have emphasized that "[a]n adverse employment action typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing

significant change in benefits." Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012) (quotation marks omitted). But the language in Section 4572 of the MHRA is broad— "conditions or privileges of employment *or any other matter directly or indirectly related to employment*"— and encompasses more than actions that had a direct economic impact on the plaintiff. See King v. Bangor Fed. Credit Union, 611 A.2d 80, 82–83 (Me. 1992) (noting, in suggesting that an "abusive reprimand" could constitute an adverse employment action, that "[t]he Act's language . . . is not . . . limited" to "hiring or firing" type decisions) (quotation marks omitted); see also Audette v. Town of Plymouth, MA, No. 15-2457, 2017 WL 2298070, at *8-9 (1st Cir. May 26, 2017) (suggesting, without deciding, that a "letter of reprimand subjecting [plaintiff] to a period of enhanced discipline" and "repeated yet unfulfilled, threats to suspend" plaintiff could constitute adverse employment actions). The Court also notes that most of the cases cited by Defendants that turned on the scope of "adverse employment actions" were decided upon summary judgment, rather than at the motion to dismiss stage. (See Mot. to Dismiss of Def. David Potter (ECF No. 11), Page ID # 156 n.4; Mot. to Dismiss of Def.'s St. John Valley Soil and Water Conservation District, et al. (ECF No. 12), Page ID #s 178-79.) At this stage in the litigation and on this record, the Court concludes that Plaintiff's MHRA claim is adequately pleaded and that dismissal would be premature, especially considering that Plaintiff may eventually further support her well-pleaded claim "by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.[12]

---

[12] Because the Court determines that Plaintiff has stated a claim for violation of the MHRA against the District, the Court need not, and does not, opine upon Plaintiff's hostile work environment or disability-related theories of MHRA liability. The Court also does not opine upon Plaintiff's contention that she was constructively discharged because she has adequately pleaded facts to support that she was otherwise subject to adverse employment action. The Court does note however, that, in regards to hostile work environment and constructive discharge, the Defendants are essentially asking this Court to gauge the extremity of the conduct Plaintiff experienced, which is an improper task for this Court at the motion to dismiss stage. See Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 473 (1st Cir. 2002) ("In undertaking to assess how 'extreme' the complained of conduct was, the district court was not determining whether the complaint adequately had alleged the elements of a hostile work environment claim, but

For these reasons, the Court DENIES the Motion to Dismiss as to the MHRA claims against the District.

### 2. MHRA, Rehabilitation Act, and Title VII claims against the Department (Counts II, VII, and VIII)

In Count II, Plaintiff alleges the same violations of the MHRA by the Department as she alleges against the District. (Compl. ¶¶ 140-45.) In Count VII, Plaintiff alleges that the Department is liable under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, because she was constructively discharged because of her disability; because it failed to engage, in good faith, in an informal, interactive process with her to determine the appropriate reasonable accommodation; and because it failed to provide her with a reasonable accommodation. (Compl. ¶¶ 157-59.) In Count VIII, Plaintiff alleges that the Department is liable under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, because she was subjected to adverse employment actions because of her sex; because she was subjected to materially adverse actions because she opposed practices that would be a violation of Title VII; because she was subjected to a hostile work environment because of her sex; and because she was constructively discharged because of her sex. (Compl. ¶¶ 161-64.)

Plaintiff does not dispute that the MHRA, the Rehabilitation Act, and Title VII only apply to the aggrieved party's "employer" in the employment discrimination context. Defendants contend that Plaintiff has not pleaded sufficient facts to indicate that the Department, as opposed

---

rather was performing an evaluative judgment, usually left to the trier of fact, as to whether the hostility or harassment that *was* alleged was sufficiently severe or pervasive enough to warrant relief.")

The Court notes that there may be a legal question regarding whether an employer is required to engage in an "interactive process" to determine the appropriate reasonable accommodation under the MHRA, as opposed to federal law. See Kezer v. Cent. Me. Med. Ctr., 40 A.3d 955, 963-64 (Me. 2012). However, the Court does not address this issue at this time considering that it was not squarely raised or briefed by Defendants as a basis for dismissing Count One.

to the District, was Plaintiff's employer. Both sides agree that, in determining whether the Department was Plaintiff's employer within the meaning of the MHRA, the Rehabilitation Act, and Title VII, the Court should consider whether the Department was a "joint employer" or "integrated enterprise" with the District despite the fact that Plaintiff was technically an employee of the District. Because the Court concludes that the "joint employer" test is inapposite,[13] the Court must consider whether Plaintiff has adequately alleged that the Department and the District are an integrated enterprise.

Although there is some lack of clarity about the dispositive elements of an integrated enterprise, the First Circuit generally has considered the extent to which there exists between separate entities "(1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership." Romano v. U–Haul Int'l, 233 F.3d 655, 662 (1st Cir. 2000).[14] The First Circuit has adopted the view that control of employment decisions "is the most important of the four factors," even if the test should not be reduced to "a one-question inquiry." Id. at 666. Put simply, "[t]he First Circuit contemplates active participation in the employment process by an entity sought to be held liable under an integrated enterprise theory." Donahue v. Clair Car Connection, Inc., 736 F. Supp. 2d 294, 315 (D. Me. 2010); see also Lopez v. Massachusetts, 588 F.3d 69, 85 (1st Cir. 2009) (determining, in Title VII context, that state

---

[13] "The basis for finding that two companies are 'joint employers' is that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Torres-Negrón v. Merck & Co., Inc., 488 F.3d 34, 40 n.6 (1st Cir. 2007) (quotation marks omitted). The Court does not consider other inapposite tests that are not raised by the parties. See Fisk v. Mid Coast Presbyterian Church, 2:16-cv-490-JDL, 2017 WL 1755950, at *3 (D. Me. May 4, 2017) (discussing the corporate law "sham" test and the "agency" test); Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 728-29 (Me. 2012) (noting "novel" employer liability theory based on 5 M.R.S.A. § 4553(4)).

[14] The Court notes that the Maine Supreme Court has recognized the integrated enterprise theory of liability but has not explicitly adopted it. Daniels, 45 A.3d at 728–29.

agency was not plaintiffs' employer because it "has no control over plaintiffs' day-to-day job performance and no right to exercise such control").

Granting that it is not entirely easy to apply the integrated enterprise inquiry to the relationship between the District and the Department, the Court concludes that Plaintiff has not alleged sufficient facts to plausibly claim that the two entities are an integrated enterprise. Plaintiff has not plausibly alleged that the Department and the District exhibit interrelated operations or common management. Most importantly, she has not plausibly alleged that the Department exercises control over the hiring or firing of the District Coordinator, controls the Coordinator's day-to-day job performance, sets the personnel policies for the position, or otherwise exercises control over the position beyond the conclusory allegation that the Department in her case "exercised oversight of her employment-related matter."[15] (Compl. ¶ 29.) Nor has the Plaintiff plausibly alleged that the Department, in the person of Rocque, exercised control over what Plaintiff contends were the adverse actions taken against her. As described above, Plaintiff does allege that Rocque offered to attend a board meeting to discuss the issues Plaintiff was having with Potter; that several board supervisors and Plaintiff's lawyer reached out to Rocque to discuss Plaintiff's complaints; that Rocque scheduled a meeting with the supervisors to discuss "board functionality" in light of Plaintiff's complaints; and that Rocque informed Plaintiff while she was out of work that, if she did not return to work, the District would not receive certain funds allocated to it. However, these allegations do not amount to a plausible claim that the Department was active in Plaintiff's employment to an extent that it can be held liable as her employer. Cf. Bennett v. Roark Capital Grp., Inc., 738 F. Supp. 2d 157, 161 (D. Me 2010) (declining to dismiss a claim

---

[15] Maine law explicitly states, "*The supervisors* [of the soil and water conservation districts] *may employ* a secretary and such other employees and contractors *as they require* in the performance of their duties." 12 M.R.S.A. § 102(2) (emphasis added).

where plaintiff had plausibly alleged that one entity "exercised control over [the] labor relations" of the other).

For these reasons, the Court GRANTS the Motion to Dismiss the claims against the Department.[16] See Fisk v. Mid Coast Presbyterian Church, 2:16-cv-490-JDL, 2017 WL 1755950, at *3 (D. Me. May 4, 2017) (dismissing claim where plaintiff had not plausibly alleged that an entity might qualify as his employer).

### 3. MHRA claims against Potter, Theriault, and Coulombe (Counts III, IV, and V)

Plaintiff also brings MHRA claims against Potter, Theriault, and Coulombe, individually and in their official capacities, because they "interfered with Plaintiff's right to be free from discrimination and retaliated against Plaintiff because she opposed unlawful practices under the

---

[16] Plaintiff contends that discovery will "shed further light on the nature of [the] relationship" between the District and the Department. (Pl.'s Obj. to Defs.' Mots. to Dismiss (ECF No. 20), Page ID # 282 n.2.) However, this speculation does not overcome the deficiencies in Plaintiff's pleading on this issue. In any event, there is nothing to indicate that further discovery would reveal the type of connection between the two entities that could establish an integrated enterprise. See, e.g., Romano v. U-Haul Int'l, 233 F.3d 655, 668 (1st Cir. 2000) (in assessing whether two entities were an integrated enterprise, stating, "most importantly . . . U–Haul International sets human resources and personnel policies, establishes the wage scale, the pay day, and all fringe benefits, must approve pay in excess of the scale, limits shift premiums and the hours of part-timers, processes payroll, prohibits payroll advances, must approve any rehire, maintains duplicate personnel records, and invites employees of U–Haul of Maine to present complaints concerning discrimination, sexual harassment and leaves of absence to U–Haul International's Human Resources Department"). Plaintiff's citation to Cannell v. Corizon, LLC and to Gagliano-McFarland v. Giri Community Drive LLC does not help her position because, in both of those cases, the complaints had alleged sufficient facts on this issue to survive motions to dismiss. See Cannell v. Corizon, LLC, 1:14-cv-405-NT, 2015 WL 8664209, at *5 (D. Me. Dec. 11, 2015) (determining that the plaintiff had sufficiently alleged a joint employer relationship between Corizon and the Maine Department of Corrections where the complaint stated that although the plaintiff was technically employed by Corizon, she worked at a facility operated by the DOC; she was required to receive training from DOC employees; she was told by a Corizon administrator that she needed to speak with the DOC deputy warden about her reports of discrimination; and that the DOC actively participated in the decision to terminate her); Gagliano-McFarland v. Giri Cmty. Drive LLC, 1:10-cv-490-GZS, 2011 WL 1883191, at *5 (D. Me. May 16, 2011) (determining that dismissal of the claim was inappropriate because "the allegations suggest a natural relation among the entities in question," several entities all owned and operated by one individual, "and depict a history of something more than purely arm's length connections"), adopted by 2011 WL 2472807 (D. Me. June 22, 2011); see also United States ex rel. Worthy v. E. Me. Healthcare Sys., 2:14-cv-184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017) ("Because the determination of joint employer status is a fact-intensive inquiry *and because Ms. Worthy has alleged enough facts indicating Accretive's control over the conditions of her employment*, her retaliation claims cannot be dismissed as to Accretive.") (emphasis added).

MHRA." (Compl. ¶¶ 147, 149 & 151.)  The Court, however, agrees with Defendants that there is no individual liability under the MHRA.  In Fuhrmann v. Staples Office Superstore East, Inc., 58 A.3d 1083, 1093-94 (Me. 2012), the Maine Supreme Court sitting as the Law Court considered whether an individual supervisor could be liable for employment discrimination under Section 4572(1)(A) of the MHRA, which prohibits unlawful employment discrimination by an "employer."  The Law Court determined that a supervisor could not be held liable under this provision because, in part, "[t]he MHRA's express incorporation of vicarious liability and its employer-specific remedies do not signal any intent to hold individual supervisors liable for employment discrimination."  Id. at 1098.  The Law Court further noted:

> If the Legislature had intended to create individual supervisor liability it would have done so explicitly in much clearer terms.  In the absence of any clear indication to that effect, we will not undermine the purpose of these statutes [the MHRA and the MWPA] by reading them to provide for individual supervisor liability.

Id. (internal citations omitted).

Plaintiff attempts to cabin Fuhrmann by noting that it did not address Sections 4633(1) and 4633(2) of the MHRA, which prohibit "a person" from discriminating, retaliating, or interfering with an individual's exercise of rights under the MHRA.  Although it is strictly the case that Fuhrmann did not address these provisions, the Court reads Fuhrmann as foreclosing any recourse to individual liability in the employment context under the Act.  In particular, the Fuhrmann court broadly stated that "the statutory scheme as a whole and its underlying policy" compelled the conclusion that "there is no individual supervisor liability for employment discrimination" pursuant to the MHRA.  Id.  Indeed, the partially dissenting justices in Fuhrmann likely understood the implicit breadth of the decision when they opined that it rendered a separate provision of the MHRA limiting punitive damages "against an employee" a nullity.  See id. at 1100 (Levy, J., concurring in part and dissenting in part).

Plaintiff offers two major arguments to the contrary. She contrasts the use of "a person" in Sections 4633(1) and 4633(2) with the use of "employer" in Section 4572(1)(A). She also contends that the Maine Human Rights Commission has adopted the position that the MHRA provides for individual liability pursuant to Sections 4633(1) and 4633(2).[17] However, the Fuhrmann court essentially addressed these arguments. The court stated that its conclusion was not changed by the use of the phrase "any person" within the definition of "employer" and in other provisions of the MHRA. Fuhrmann, 58 A.3d at 1094-96. The court also rejected the argument that a contrary interpretation by the Commission should control, specifically concluding "that the Commission's interpretation of the statutes exceeds legislative intent and is contrary to that intent." Id. at 1097. This Court therefore joins those other courts that have looked to Fuhrmann in determining that there is no individual liability for employment discrimination under Section 4633 of the MHRA. See United States ex rel. Worthy v. E. Me. Healthcare Sys., 2:14-cv-184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017); Enos v. Orthopedic & Spine Physical Therapy of L/A, No. CV-13-176, 2014 Me. Super. LEXIS 225, at *9-10 (Me. Super. Ct. Nov. 18, 2014).

For these reasons, the Court GRANTS the Motions to Dismiss as to the MHRA claims against Potter, Theriault, and Coulombe.

### 4. Rehabilitation Act claim against the District (Count VI)

In Count VI, Plaintiff alleges that the District is liable under the Rehabilitation Act because she was constructively discharged because of her disability; because it failed to engage, in good faith, in an informal, interactive process to determine an appropriate reasonable accommodation;

---

[17] Because it does not change the outcome on this issue, the Court assumes without deciding that Plaintiff has accurately characterized the Maine Human Rights Commission's current position and that the Commission memo and meeting minutes cited by Plaintiff (see Pl.'s Obj. to Defs.' Mots. to Dismiss, Page ID #s 285-86; Pl.'s Statement of Add'l Auth. (ECF No. 21), Page ID # 308) may properly be considered at this stage.

and because it failed to provide her with a reasonable accommodation.  (Compl. ¶ 153-55.)  To state a claim for disability discrimination under the Rehabilitation Act, a plaintiff must allege "(1) that she was disabled within the meaning of the [Rehabilitation Act]; (2) that she was able to perform, with or without reasonable accommodation, the essential functions of her job; and (3) that the adverse employment decision was based in whole or in part on her disability."  Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 18 (1st Cir. 1998).[18]  To state a claim for failure to make a reasonable accommodation for disability under the Rehabilitation Act, a plaintiff must "allege a disability covered by the statute, the ability of the plaintiff to do a job with or without accommodation . . . and the refusal of the employer, despite knowledge of the disability, to accommodate the disability by reasonably varying the standard conditions of employment."  Sepúlveda-Villarini v. Dep't of Educ. of Puerto Rico, 628 F.3d 25, 28 (1st Cir. 2010).  Generally, "[t]he plaintiff bears the burden of showing the existence of a reasonable accommodation" by demonstrating that "the proposed accommodation would enable her to perform the essential functions of her job," and that it is "facially reasonable."  Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017) (quotation marks omitted).

The Court readily determines that Plaintiff has adequately pleaded a plausible claim of failure to provide a reasonable accommodation.[19]  However, one element of her claim warrants

---

[18] "Relief available under the Rehabilitation Act is coextensive with relief under the [Americans with Disabilities Act], and the analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds."  LaFlamme v. Rumford Hosp., 2:13-cv-460-JDL, 2015 WL 4139478, at *13 (D. Me. July 9, 2015) (quotation marks omitted); see also 29 U.S.C. § 794.  Plaintiff has pleaded that, at all material times, the District "has operated a 'program or activity receiving Federal financial assistance' within the meaning of 29 U.S.C. § 794."  (Compl. ¶ 8.)

[19] Because Plaintiff has adequately pleaded that the District failed to provide her with a reasonable accommodation, the Court declines to opine on the disability discrimination theory underlying Plaintiff's Rehabilitation Act claim at this stage of the litigation.  Defendants do not appear to contend that Plaintiff has failed to adequately plead that she has a qualifying disability under the Rehabilitation Act/ADA, and the Court determines that she has adequately pleaded this element.  See 42 U.S.C. § 12102(1)(A) (defining, in part, the term "disability" for purposes of the Rehabilitation Act as "a physical or mental impairment that substantially limits one or more major life activities").

further analysis. Defendants contend that the accommodation Plaintiff sought—specifically, resuming her employment as the sole District employee without attending board meetings or otherwise interacting with Potter—is not facially reasonable. It is clear, however, that the reasonableness of an accommodation is a fact-intensive inquiry ill-suited for determination on a motion to dismiss. See Echevarría, 856 F.3d at 128 (noting that whether an accommodation is reasonable "turns on the facts of the case") (quotation marks omitted); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 650 (1st Cir. 2000) ("These are difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes."); Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 515 (1st Cir. 1996) ("[C]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior."). Therefore, the Court cannot conclude, on this record, and in light of Plaintiff's plausible allegation that the accommodation she sought was reasonable, that she has failed to state a claim under the Rehabilitation Act.

For these reasons, the Court DENIES the Motion to Dismiss as to the Rehabilitation Act claim against the District.

### 5. Equal Protection claims against Potter, Theriault, and Coulombe (Counts IX, X, and XI)

In Counts IX through XI, Plaintiff alleges that Defendants Potter, Theriault, and Coulombe, in their individual and official capacities, violated her constitutional equal protection rights "by discriminating against Plaintiff because of her sex, failing to stop the retaliation against Plaintiff for complaining about sexual discrimination, and by [themselves] retaliating against Plaintiff for complaining about sexual discrimination." (Compl. ¶¶ 166, 168 & 170.) "When a plaintiff attempts to use § 1983 [*i.e.*, bring a civil action based on the deprivation of constitutional rights] as a parallel remedy to a Title VII claim, the *prima facie* elements to establish liability are the same

under both statutes." Rivera v. Puerto Rico Aqueduct and Sewers Auth., 331 F.3d 183, 192 (1st Cir. 2003) (footnote omitted). Plaintiff reasonably implies that if she has stated a plausible claim under Title VII or the parallel discrimination provisions of the MHRA, she has stated a plausible § 1983 claim for violation of her equal protection rights against the individual defendants. (See Pl.'s Obj. to Defs.' Mots. to Dismiss (ECF No. 20), Page ID # 303 n.20.) However, the First Circuit has made clear that an Equal Protection claim involves an additional element not present in garden-variety employment discrimination claims—"[s]ome evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim." Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 32 (1st Cir. 2012) (quotation marks omitted); see also King v. Maine Dep't of Corr., 1:13-cv-163-JDL, 2015 WL 2092526, at *3 (D. Me. May 5, 2015) ("To state a claim for violation of equal protection, the plaintiff must allege that she was treated differently than were others similarly situated, and that the difference in treatment was based on an impermissible consideration.")

The Court is unconvinced by Plaintiff's arguments to the contrary. Specifically, the cases Plaintiff cites for the proposition that Title VII and Equal Protection claims have entirely identical elements only stand for the proposition that the analytical framework *for showing discriminatory intent* is the same for both types of claims. See Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 896 (1st Cir. 1988) ("Because a showing of discriminatory intent is also necessary to make out a claim of disparate treatment under Title VII, we have recognized that the analytical framework for proving discriminatory treatment [under Title VII] . . . is equally applicable to constitutional and Title VII claims.") (alteration and ellipsis in original) (quotation marks omitted); King, 2015 WL 2092526, at *1, 3 (considering the elements of a Title VII claim in relation to an Equal Protection claim, but allowing amendment of the complaint to include the Equal Protection claim where the

defendant "would counsel and discipline [p]laintiff for commonplace clerical errors that were not similarly addressed when committed by heterosexual male corrections officers [and] [p]laintiff maintains that certain male officers committed more serious infractions and were not disciplined, or not disciplined as severely as she was for only minor infractions.") The Court does not understand any of the cases cited by Plaintiff to abrogate the necessity of considering whether similarly situated persons were treated differently when evaluating an Equal Protection claim.

In her Amended Complaint, Plaintiff does allege that "[b]ased on information and belief, Defendants Potter, Theriault, and Coulombe have treated Plaintiff's [male] replacement courteously throughout his employment without similar conduct to that directed at Plaintiff." (Compl. ¶ 128.) The Court notes that a plaintiff asserting an Equal Protection claim cannot "rest on subjective characterizations or conclusory descriptions of a general scenario which *could* be dominated by unpleaded facts." Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992) (quotation marks omitted). However, although this is an extremely close case, the Court concludes that it would be premature to dismiss Plaintiff's claim considering that she has plausibly pleaded an equal protection claim despite being in a difficult position to the extent that 1) she was the only employee of the District at the time of her allegedly unlawful treatment, and 2) she may not know, at this stage of the litigation, details about her replacement's treatment by Defendants.

For these reasons, the Court DENIES the Motions to Dismiss as to the Equal Protection claims against Potter, Theriault, and Coulombe.

**6. First Amendment claims against Potter, Theriault, and Coulombe (Counts XII, XIII, and XIV)**

Finally, in Counts XII through XIV, Plaintiff alleges that Defendants Potter, Theriault, and Coulombe, in their individual and official capacities, violated her First Amendment rights "by

failing to stop the retaliation against Plaintiff for complaining about matters of public concern, and by [themselves] retaliating against Plaintiff for complaining about matters of public concern" (Compl. ¶¶ 172, 174 & 176.)  Plaintiff specifies that the alleged retaliation was "for speaking against Potter's plan to misuse government funds to purchase heavy equipment; for reporting to the Supervisors and [the Department] retaliation by Potter for her refusal to engage in illegal activity; and for reporting to the Supervisors and [the Department] sexual harassment by Potter." (Pl.'s Obj. to Defs.' Mots. to Dismiss, Page ID #s 300-01.)  "[T]o prevail on a § 1983 claim of retaliation for First Amendment activity, a plaintiff must show: (1) that [her] conduct was constitutionally protected, and (2) that this conduct was a substantial factor or a motivating factor for the defendant's retaliatory decision."  Rosaura Bldg. Corp. v. Municipality of Mayagüez, 778 F.3d 55, 66 (1st Cir. 2015).[20]  The threshold inquiry for whether a plaintiff's conduct fell within the protection of the First Amendment in this context is "whether the employee spoke as a citizen on a matter of public concern."  Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quotation marks omitted).  Defendants contend that when Plaintiff raised an issue about the plan to buy surplus equipment or about her harassment she was not speaking as a citizen on a matter of public concern.  Further, Defendants contend that they are entitled to qualified immunity.  Although Defendants' arguments might have some purchase on summary judgment, the Court determines that it would be premature to dismiss the First Amendment claims, for several reasons.

---

[20] To the extent Defendants contend that Plaintiff has not adequately pleaded there was retaliatory action against her based on First Amendment-protected conduct, the Court determines that Plaintiff has done so.  See Leahy-Lind v. Maine Dep't of Health and Human Servs., 1:13-cv-389-GZS, 2014 WL 4681033, at *20 (D. Me. Sept. 19, 2014) (noting that a campaign of harassment based on "relatively minor events" can support a First Amendment retaliation claim "so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights") (quotation marks omitted).

First, the Court cannot determine at this stage that Plaintiff was not speaking as a citizen when she raised an issue with the plan to purchase surplus property.[21] Speech made pursuant to a plaintiff's official duties is not protected by the First Amendment because "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." O'Connell v. Marrero-Recio, 724 F.3d 117, 123 (1st Cir. 2013) (quoting Garcetti v. Ceballos, 547 U.S. 410, 421-22 (2006)). Defendants analogize Plaintiff's speech to the speech at issue in O'Connell, in which the First Circuit determined that a public agency human resources director was not speaking as a citizen when she communicated to her supervisors "her reluctance to undertake personnel-related actions that she deemed either illegal or unethical." Id. But this case is distinguishable. While it is true that Plaintiff alleges she initially informed the supervisors that she would "not do anything illegal" (Compl. ¶ 49), it is unclear to what extent the plan implicated her job responsibilities and to what extent she would have been responsible for bringing the plan to fruition. In other words, it is not at all clear that her speech was made pursuant to her official duties. Further, Plaintiff has adequately pleaded facts to support that she subsequently raised the issue in her "grievance report" and raised the issue on other occasions as she pursued her complaints with the supervisors and with Rocque.

Second, it is plausible that the plan to buy the surplus equipment is a matter of public concern because it involves potential corruption and misuse of public funds. See Lane v. Franks, 134 S. Ct. 2369, 2380 (2014) ("[C]orruption in a public program and misuse of state funds . . . obviously involves a matter of significant public concern."); Decotiis, 635 F.3d at 30 (noting that speech regarding "official malfeasance or the neglect of duties" is "of inherent public concern").

---

[21] Because Plaintiff has stated a plausible First Amendment claim arising from the surplus equipment plan, the Court does not opine on the more complex question of whether her personal complaints regarding sexual harassment and discrimination constitute speech as a citizen on a matter of public concern rather than unprotected employee grievances.

Third, to the extent Defendants Theriault and Coulombe argue that they themselves did not take any action to discriminate or retaliate against Plaintiff based on her speech, more discovery is necessary to determine what roles they played given Plaintiff's plausible allegations of their involvement in the actions taken against her. Finally, because Plaintiff has stated a plausible claim for relief but more discovery is necessary to uncover the full parameters of her speech-related claim, it is premature to consider whether any of the Defendants are entitled to qualified immunity.

For these reasons, the Court DENIES the Motions to Dismiss as to the First Amendment claims against Potter, Theriault, and Coulombe.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion to Amend Complaint (ECF No. 19); GRANTS IN PART Defendants' Motions to Dismiss (ECF Nos. 11 & 12) and DISMISSES Counts II, III, IV, V, VII, VIII; and otherwise DENIES IN PART Defendants' Motions.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 20th day of June, 2017.