# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DIANE M. CHARETTE,                        )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )
                                          )   Docket no. 1:17-CV-35-GZS
ST. JOHN VALLEY SOIL AND WATER            )
CONSERVATION DISTRICT, et al.,            )
                                          )
                                          )
                    Defendants.           )


## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the Court is a Motion for Summary Judgment by Defendants St. John Valley Soil and Water Conservation District, Duane Theriault, and Kurt Coulombe (ECF No. 67) ("Joint Motion") and a Motion for Summary Judgment by Defendant David Potter (ECF No. 68) ("Potter's Motion"). After careful review of the record and the parties' briefs, the Court GRANTS IN PART and DENIES IN PART the Joint Motion and GRANTS IN PART and DENIES IN PART Potter's Motion, for the reasons outlined below.


## I. LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is

one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II. FACTUAL BACKGROUND

Having reviewed the record and the statements of material fact in accordance with Local Rule 56, "the Court constructs the following narrative from the undisputed facts as well as the disputed material facts viewed in the light most favorable to the non-movant," here, Charette. Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 5 (D. Me. 2014).[1] The St. John Valley Soil and Water Conservation District (the "District") is a state agency created by statute, with the purpose of, among other things, carrying out preventive and control measures with respect to flood prevention and the conservation, development, utilization, and disposal of water within the district, and of providing information, education, and technical assistance needed to help protect and enhance natural resources and to use them wisely.[2] The District occupies space in an office leased by the United States Department of Agriculture, Natural Resources Conservation Service ("NRCS") in Fort Kent.[3]

The District is governed by a five-member, volunteer Board of Supervisors, who are either elected or appointed by the Commissioner of the Maine Department of Agriculture, Conservation and Forestry ("DACF"), and an Associate Supervisor appointed by the Board of Supervisors. During 2015 and 2016, the District's Board of Supervisors consisted of Defendant David Potter,

---

[1] As a preliminary matter, the Court DENIES Defendants' request to strike paragraphs 148, 170, 174, 177, 206, and 251-53 of the Statement of Material Facts (ECF No. 66), and recites the facts in those paragraphs to the extent the Court deems them relevant. To the extent Defendants have objected to Plaintiff's characterization of documents in the record, the Court relies on the text of the documents in assessing the evidence that would be available to a factfinder. The Court GRANTS IN PART Defendants' request to strike paragraphs 134, 136, 141, 144, 159, 170, 176, and 180-82 to the extent those paragraphs rely on allegations in the Second Amendment Complaint that were denied by Defendants. However, the Court still considers the facts in those paragraphs to the extent they are supported by other admissible record evidence. Defendants' requests to strike based on hearsay objections are discussed at the appropriate places in the recitation of facts.

[2] The District is not currently asserting any form of immunity based on its relationship to the State of Maine.

[3] It appears from the record that staff members of the United States Department of Agriculture, Natural Resources Conservation Service ("NRCS") regularly attend District Board meetings.

Defendant Duane Theriault, Defendant Kurt Coulombe, John "Gene" Desjardin, Peter Smith, and an Associate Supervisor, Thomas Schneck.[4] At all relevant times, Potter was self-employed as the sole employee of his Fort Kent farm. Theriault was self-employed on the farm he owns with his father in St. Agatha. Coulombe was employed as an equipment operator by a contractor in Madawaska. The Board of Supervisors elected Potter as Chair of the Board in March 2014. The Board generally meets on a monthly basis. Board meetings are open to the public.[5] Unless otherwise noted, the District had a sole employee, a District Coordinator, during the periods at issue.

In 2014, after the previous District Coordinator left the position, the Supervisors undertook a hiring process. Although the exact mechanics of the hiring process and how many people were offered the position is ambiguous, it appears that the District's first choice after interviews was a woman who ultimately rejected the offer. (Joint Stipulated Record ("SR") 216-17; 285-86.)[6] Eventually, when Plaintiff Diane Charette was under consideration as a potential hire, Potter was opposed to hiring her because he believed she lacked qualifications. (SR 286.) Theriault was also opposed to hiring her because he thought she was not the right person for the job. (SR 376.) Smith believes that Potter had wanted to hire what Smith considered to be a less-qualified man. (SR 347-48.) In the end, however, the District hired Charette as District Coordinator as of August 26, 2014. As District Coordinator, Charette's job responsibilities included acting as receptionist for the District office; attending and reporting at monthly Board meetings; working closely with the

---

[4] Associate Supervisors may be vested with limited voting authority, as determined by the Board of Supervisors. However, the Court follows the parties in not delving into the specifics of Schneck's role on the Board or during the events at issue in this case.

[5] It is unclear from the record whether any members of the public actually attended any of the Board meetings discussed in this Order.

[6] Unless otherwise indicated, all citations in the factual background are to the Joint Stipulated Record ("SR") (ECF Nos. 55-65) as paginated by the parties.

Board to implement the District's Long Range Plan; carrying out the directives of the Board of Supervisors as conveyed at its meetings; communicating weekly with the Board Chair; performing office administrative and business management duties; carrying out administrative functions such as maintaining minutes of the Board meetings, reporting monthly activities, and keeping balance sheets and profit/loss statements; attending other meetings as approved by the Board Chair; developing media relations and producing press releases; communicating with District members and recruiting new members; engaging in fundraising activities associated with specific projects and programs; maintaining eligibility for federal grants; and other projects and assignments as assigned by the Board. Charette's job responsibilities also included providing office support to NRCS staff pursuant to an Operational Agreement, working on certain projects for the NRCS pursuant to a Contribution Agreement, and complying with USDA security requirements, which included obtaining a LincPass. A LincPass is required, in connection with security clearance, to access the U.S. government's computer systems. Previous District Coordinators Casey Cote and Sigrid Houlette regularly attended monthly Board meetings; reported to the Board members on various issues, including projects in progress; took notes; and prepared the Board meeting minutes for the public record. Cote, who was District Coordinator from May 2008 until December 2010, has stated,

> An important part of my job was to report directly to the Board members at the meetings about District business. I took notes during the meetings and prepared the minutes for the public record. It was a central part of my duties as District Coordinator to attend Board meetings and meet with the Board Chair as my supervisor.

(SR 411.) Houlette, who was District Coordinator from February 2011 until April 2014 has stated,

> As the District Coordinator, I attended the monthly meetings of the Board of Supervisors. At these meetings, I reported to the Board members on various issues, including the projects I was working on and the progress I had made on tasks that the Board has assigned to me at the prior month's Board meeting. I also took notes

during the meetings and prepared the minutes for the public record. Attending
Board meetings and communicating with the Board Chair at and between meetings
was an integral part of my job as District Coordinator.

(SR 412.)

Charette received a copy of, and read, the District's Personnel Policy and the District

Coordinator job description before she started working for the District. Pursuant to the District's

Personnel Policy, Charette was an employee at-will, subject to a six-month probationary period

that could be extended. Charette worked a flex schedule of thirty-two hours per week, which

allowed her to choose the specific hours she worked. Although the Board is responsible for hiring

and general long-term supervision of the District Coordinator, the Board Chair is responsible for

supervising the District Coordinator on a daily or weekly basis, as needed.

During the majority of her time as District Coordinator until she went out on a leave of

absence, Charette was the District's sole employee. During her first two weeks on the job,

however, Anthony Tardif, who had served the District as a temporary employee between District

Coordinators, helped orient her to the office. During this period, Charette noticed a difference

between the way Potter interacted with Tardif and how Potter interacted with her. (SR 172.) Potter

was more patient with Tardif, and his tone of voice with Tardif was softer than it was with Charette.

(Id.)[7] Theriault and Coulombe did not work with, supervise, or have workplace interactions with

Tardif while he was orienting Charette to the office at the start of her employment.

Potter was Charette's direct supervisor, but his in-person contact with her was generally

limited because he continued to own and maintain his farm. The frequency of their in-person

office interactions varied from a couple of times a week to every other week, with each encounter

---

[7] Defendants contend that "Potter did not work with, supervise, or have work place interactions with . . . Tardif while
he was orienting Charette to the office at the start of her employment." (Statement of Material Facts (ECF No. 66)
¶ 16.)

ranging in duration from five or ten minutes to an hour-and-a-half. Potter otherwise communicated with Charette by email and phone. Theriault and Coulombe were present in the District office only occasionally and for brief periods of time because they also maintained their separate occupations. Charette had in-person contact with all of the Supervisors during monthly Board meetings.[8]

On a day in October or November 2014, Potter visited the District office and Charette asked him about obtaining updated office equipment. Potter sat at Charette's desk and informed her that the previous Board Chair (Craig Troeger, a man) and the previous District Coordinator (Houlette, a woman) had a very close relationship, which he insinuated was probably closer than it should have been. Potter said that he and Charette would not have that kind of relationship and angrily informed her, "you're not going to get your way, not even if you dance naked on the table."[9] (SR 128.) Charette was shocked and highly offended by the comment and described her reaction as follows: "[W]hat I felt was I was female and I was not going to be getting my way, and it wasn't just that I wasn't going to get my way for one issue, I was not going to get my way for any issues. . . . I was insulted." (SR 129.) Robert Bills, then a District Conservationist for the NRCS in the Fort Kent office, was present when Potter made the "dance naked" comment, noticed that Charette was taken aback by the comment, was himself shocked by the comment, and thought that Charette

---

[8] The parties dispute whether the Supervisors were satisfied with Charette's job performance and attitude throughout her tenure as District Coordinator. (See, e.g., Statement of Material Facts ¶¶ 28-29; 81; 133; 220; 242.) Ultimately, this dispute is not germane to the Court's decision because Charette was not terminated and Defendants do not clearly contend that they took any relevant actions based on dissatisfaction with Charette's performance.

[9] Charette has alternatively remembered Potter stating that she "'would not have [her] way with him' even if [she] 'were to dance naked on the desk.'" (SR 648.)

should speak about it with Seth Jones, another District Conservationist in the Fort Kent office. (Id.)[10]

On a different day prior to the November 2014 Board meeting, Potter asked Charette to research a state surplus property program to find out how it worked.  Specifically, Potter asked Charette to research the program, get the paperwork started for the District's possible participation, and follow up with Dave Rocque, a liaison for the District with the DACF.  The District did not have any projects planned or underway to use equipment it could purchase through the surplus property program.  At this point, Charette did not think that any of the tasks Potter asked her to perform were unlawful.  Potter did not ask Charette to try to purchase property through the program or to sell any property obtained through the program.

The District is authorized by statute to buy and sell agricultural and engineering machinery and equipment as well as to "make available" such equipment to "land occupiers within the district . . . as will assist such land occupiers to carry on operations upon their lands" in a manner consistent with the District's mission.  12 M.R.S.A. § 6(3)-(4).  The parties contest what specific surplus property program Charette, Potter, or the other Supervisors had in mind in November 2014 and during their subsequent discussions concerning surplus equipment, and the record is not entirely clear on this issue.  However, the surplus property program administrated by the State Agency for Federal Surplus Property creates a variety of conditions and restrictions on the District's ability to acquire, retain, and resell surplus equipment.  (See Statement of Material Facts (ECF No. 66) ¶ 31.)

---

[10]  To the extent the account provided by Robert Bills in his first declaration, dated September 20, 2017, differs from Charette's account of the "dance naked" comment and its immediate aftermath (see SR 407), the Court credits her account for purposes of this Order.  The Court also notes that it reads Bills' second declaration (SR 448-49), which is generally more favorable to Charette, as supplementing rather than contradicting his first declaration.

Due to some confusion on her part and bureaucratic impediments, Charette was initially unable to obtain a "donee number," which would be required for the District to participate in the surplus property program. However, she was in the process of filling out the paperwork for the District to participate at the time of the Board's November meeting. In researching the program, she learned that it was possible for a qualified entity to purchase equipment worth $40,000 to $50,000 for as little as $2,000 to $3,000, or equipment worth $40,000 to $80,000 for as little as $10,000 to $15,000, and she may have shared this information with Potter. The District had approximately $85,000 or $90,000 available in a savings account.

At the November 12, 2014, monthly Board meeting, the Supervisors asked Charette about the status of her research into the surplus property program, but she did not have any new information to provide. Potter stated that the District could make money by acquiring equipment at a reduced price though the surplus property program and then reselling it. The discussion turned to questions about how long the District would have to keep property it purchased before reselling it and whether Supervisors could personally buy any resold equipment from the District. Theriault stated that he wanted a dump truck for himself and that "it would be a great deal." (SR 124.)

Desjardins then stated that the District had learned in the past through communications between the previous District Coordinator and Rocque that it was illegal to purchase equipment through the surplus property program without a purpose for it other than reselling. Desjardins also described his experience with a different organization that had purchased property through the surplus property program and had been told to stop buying property with the purpose of reselling or had been advised that it is unlawful to resell property before the donee has held the property for at least 18 months; Desjardins said something to the effect of "we've done this in the past until we were told that we had to stop doing it." (SR 124, 168-69.) At the time, Charette misunderstood

and believed that Desjardins was stating that *the District* had previously been told to stop reselling surplus equipment. Potter responded to Desjardins, "then we're going to continue doing it until they tell us to stop," presumably meaning that the District would pursue the purchase of surplus equipment for resale until told not to do so. (SR 124.) Charette responded, "I am not going to do anything illegal" or "no, I'm not going to do it, it's illegal, I'm not going to do that, you can't make me do anything illegal." (SR 125, 385.) Potter became agitated and said, "I suppose now you're going to start telling me how to do my job." (SR 127.) Charette responded, "[N]o, I'm just going to say how I'm going to do my job." (Id.) Potter replied in part, "[W]ell, you have to do it, even if it's illegal." (SR 386.)[11]

Before the meeting adjourned, Potter and the other Supervisors instructed Charette to continue researching the District's potential participation in the surplus property program. Charette believed that what was being proposed regarding the surplus property program was illegal and that she was being asked to participate in illegal activity herself. At the conclusion of the meeting, Charette thought that Potter "was extremely angry, very agitated." (SR 172.) The November Board meeting minutes, which were drafted by Charette, do not make any mention of a discussion concerning surplus property. (See SR 105-06.)

The next morning, on November 13, 2014, Potter came in to the District office in the same mood as when he had left the Board meeting the night before, angry and agitated. He told Charette that he had been looking at home for the resignation letter of the former District Coordinator so that he could respond to her request for unemployment benefits. Potter then discovered that

---

[11] Defendants contest almost the entirety of this exchange. Theriault stated in his deposition that Potter said Charette would have to pursue the District's participation in the surplus property program "even if it's illegal," but claims that Potter was either joking, "contradicting her because she was . . . contradicting him," or sarcastically "saying, oh, yeah, it's illegal so let's just do it . . . because it really wasn't illegal [to] get[] a donee number." (SR 386.)

District files had been moved and the file cabinets rekeyed during a recent office renovation. Charette tried to explain to Potter that he had taken his files home before the renovation, but Potter believed she was being evasive and had moved his files without his knowledge or permission. He began yelling and angrily accused her, with his fists clenched, of taking his files.[12] Bills was present and Potter also became angry at him about the files. Potter later found the resignation letter he was looking for at home, but he did not apologize to Charette for his outburst.[13]

Over some period of time between the November 13th "missing files" incident and the Board meeting on January 14, 2015, Charette told all of the Supervisors about Potter's conduct regarding the files and the "dance naked" comment. When she told Coulombe, his reaction was that he did not want to deal with it, but that her complaints should be addressed by the Board. (SR 132, 217.) When she told Theriault, he said that he did not know how to handle the situation, but that he would look into it. Coulombe told Potter that Charette had approached him with her concerns.[14] At some point, Potter talked with Theriault about wanting to resign in part because he was unhappy at himself for his outburst regarding the files.

From the very beginning of her employment, Charette felt that Potter did not like women based on his tone towards her, her sense that there was very little she could do that he would find acceptable, and how he interacted with Tardif compared to how he interacted with her. She had been in business for a long time and he was the first man she had come across who made her feel that way. Potter had spoken to Charette in a stern and aggressive tone of voice since the beginning

---

[12] It is unclear whether Potter was concerned about personal files unrelated to the District, personal files from his District work, or both.

[13] Potter contends he later found some of the files he was looking for on Charette's desk. (SR 290.)

[14] Potter contends that he had no knowledge of Charette's complaints until her attorney raised the topic at the January 14th meeting. However, Coulombe clearly testified at his deposition that he told Potter about Charette's complaints at some point before the meeting. (SR 218.)

of her employment.  After the November Board meeting, however, he became more hostile.  Each time they interacted, Potter was confrontational, belligerent, and arrogant.  His hostile tone was serious enough to alarm and frighten Charette; she became more withdrawn and would cower around him.   Potter also began intensely scrutinizing her work by asking her questions and reviewing documentation, her timesheets, her tasks, and how she was communicating.

At unspecified times, Charette was told by Desjardins, Rocque, and the prior Board Chair Troeger, that Potter had "serious problems with women."  (SR 143-44.)  Specifically, Desjardins told her that Potter had "been hard on" the prior female District employees and that this had led him to believe that Potter had problems with women.  (SR 143, 173.)  Rocque told her that he believed Potter had issues with women because the female District employees kept leaving.  (SR 173.)  Troeger told Charette that Cote had complained about Potter and that Troeger had told the Supervisors to only have contact with Cote during Board meetings.  (SR 143-44.)  Beyond this information, Charette did not know the specific nature of Potter's "problems" with the prior employees.  (Id.)

Desjardins had been a Supervisor for the past ten years and had seen Potter treat women differently than men, in his estimation.  (SR 247.)[15]  Houlette had complained to Desjardins that

---

[15] When initially asked why Potter might have "harassed" the District's female employees, Desjardins stated, "he was just being Mr. Potter.  He harassed everybody."  (SR 247.)  This was followed by a somewhat ambiguous exchange:

> Q: Did you see him treating women differently than men?
> A: Oh, yes.
> Q: How so?
> A: Because a male would have [stood] up and he would have slapped him.
> Q: Did he behave any differently in the way he interacted with women than men?
> A: Oh, yes.
> Q: How so?
> A: Well, his friends, he was nice to them, meaning Mr. Coulombe and Theriault.
> Q: How about [Tardif], how did he behave toward [him]?
> A: Good.

(SR 247.)

she was "harassed" by Potter in that Potter was "picking on her." (SR 260.) Annette DeCroix, a previous administrative assistant with the District, had also complained to Desjardins that she was being "harassed" by Potter but did not provide any specifics and Desjardins did not investigate further. (Id.) Desjardins also understood that Cote had complained to Troeger that Potter "would ask I need this and this and this." (Id.) In general, Desjardins understood that Potter had been "pushing," that is, being demanding of, the previous female District employees. (SR 247.)[16]

Desjardins was concerned about the way Potter treated Charette during Board meetings; he was very rude and would shout numbers at her. Potter also frequently referred to Charette as being a probationary employee, which Desjardins understood to be a threat that her days with the District were numbered. (SR 246, 262.) Desjardins and Potter themselves did not get along and Potter would often ignore him. For Desjardins, there was "not much to like" about Potter. (SR 259.)

Smith had been a Supervisor since the time Charette was hired. Smith "leaned towards" thinking that Potter has problems with women based on his history of conflict with District female employees. (SR 355.) Smith observed that Potter "was always on [Charette's] case," telling her that she was not doing things as they should be done and repeatedly reminding her that she was a probationary employee. (SR 347.) Desjardins and Smith both believed that Charette was getting

---

[16] Defendants move to strike much of Charette's and Desjardins' testimony regarding the previous female District employees based on hearsay objections. "It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted." Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) (quotation marks omitted). Plaintiff contends that this testimony is admissible, in part to rebut the affidavits of Sigrid Houlette and Casey Cote, in which they both contend that Potter treated them fairly and did not treat them differently because they are women. (See SR 410-14.) Because the Court sees some possibility that Charette's and Desjardins' testimony could be admissible at trial, and out of an abundance of caution, the Court DENIES Defendants' requests to strike this testimony.

a "bum deal" and that Potter was micromanaging her to the point that she was becoming stressed. (SR 354.)

Typically, either Bills or Jones was present in the NRCS office or at Board meetings when Potter interacted with Charette. Jones thought that Potter could be loud and pushy but did not observe any conduct or interactions between Potter and Charette that he thought were inappropriate. Bills considered Potter's normal style to be aggressive and abrupt—he sometimes used a loud voice, and he could have a challenging, stern, dismissive, or accusatory tone with people, including with Bills. Bills observed that Potter was professional with Jones and usually with the other Supervisors. Bills also observed that Potter never challenged Tardif in the same way that he challenged Charette. From Bills' perspective, Potter's hostile and accusatory tone towards Charette was serious enough to alarm and frighten her.

Indeed, Charette began experiencing anxiety due to her interactions with Potter. She was afraid to be alone in the office with him and requested to Jones and Bills that one of them be in the office with her at all times. On three occasions (presumably when Potter was present), Charette had to leave the office to go to the restroom because she could not handle the stress and needed time alone to cry and regain her self-control. On another occasion, Charette called Desjardins at his home and informed him, crying, that she was going to leave her job because Potter had emailed her that he would be coming in to the office. Desjardins called Rocque, and Rocque immediately called Charette. Rocque asked her not to leave, told her that "they" were aware of the situation, and told her that it would be taken care of. (See SR 639-40.)

On November 17, 2014, Charette attempted to contact Potter to have him sign her paycheck but received no response to her calls and emails. Charette then contacted Coulombe, who was able to reach Potter right away. Coulombe told Charette that Potter said he could not make it in to the

office, so Coulombe signed her paycheck. Charette felt that Potter had purposefully refused to sign. It is possible that Potter signed Charette's paycheck on subsequent occasions, as did Coulombe.

Potter was absent from the December 9, 2014, monthly Board meeting for unexplained reasons. At this meeting, the Board discussed the surplus property program "as a means to make money for the District." (SR 108.) Charette said that she would continue to look into the program and volunteered to get more information from a contact at the Madawaska town office. Charette no longer objected to researching the surplus property program because she understood at the time of the December meeting that the District was considering using surplus equipment for two District projects. Charette also wanted to bring in her contact from Madawaska to explain the program's legalities.

On December 11, 2014, Charette sent an email to Potter, Theriault, and Coulombe explaining that she was having "major issues" with the existing word processing program on the District laptop and requesting an upgrade. (SR 54.) Charette had access to two computers in the District office: a District laptop and an NRCS desktop. At the September Board Meeting, the Board had voted that all District work was to be done on the District laptop and that any work done on the NRCS computer would need to be backed up to the District's laptop. (SR 176, 766.) Potter forwarded Charette's email to Schneck with the question, "[t]hink we should put this in the 2015 budget?" (SR 53.) Schneck responded with his support for the proposal. Potter then replied: "I agree that we should update the software on our laptop next year. But, I see no reason why the work can't be done now on the NRCS computer. It[']s right there in front of her. What am I missing?" (Id.) Schneck replied: "I am in total agreement with you. Next year would be good to

update the system." (Id.)  Charette did not bring the matter up further.  The Board's budget for the next year began on January 1, 2015, a few weeks after the email exchange.[17]

During the period that Charette was District Coordinator, she worked from home twice due to snow storms.  The Personnel Policy at the time did not explicitly prohibit the District Coordinator from working from home, but there also was no formal policy regarding working from home.  Charette did not seek permission from the Board or let Potter or any of the other Supervisors know that she was going to be working from home.  Prior to both days she worked from home, Jones had informed Charette that there was a storm coming and that the NRCS would possibly close the office.  Charette responded to Jones that she was working on the District website, which was a major project, and would therefore work from home on the District laptop rather than travelling in to the office and risk having to return home early.  On one of the days Charette worked from home, the NRCS ended up keeping the office open; on the other day, the office closed early at 11:30 a.m.

On December 29, 2014, Potter angrily confronted Charette about working from home.  Charette responded by explaining that she had only worked from home on two days during snowstorms, that she was unaware it was impermissible, and that she would not do so in the future without permission.  On December 30, 2014, Potter circulated a "memo" by email to Charette and the other Supervisors "as follow-up to our discussion yesterday."  (SR 733.)  The memo stated:

> Diane.  I just wanted to restate that working at home and including these hours when submitting payroll hours is not acceptable and you are, therefore, required to stop this practice immediately.
>
> For clarification: As you know, you are an hourly employee not a salaried employee and you were specifically hired for office coverage.  As a new employee, you are still within the six month probationary period.

---

[17] The record is unclear as to whether Potter informed Charette that the computer upgrade would be put in the next budget or whether she was otherwise made aware of the substance of the email exchange between Potter and Schneck. It is also unclear whether a computer upgrade was in fact put in the next budget.

The Board of Supervisors does try to keep our Personnel Policies clear and up to date and we will include this matter on [the] January agenda. I appreciate your cooperation as we improve the clarity of our Personnel Policies.

(SR 734.)

Charette responded by email to Potter and the other Supervisors in relevant part as follows:

I am a bit surprised to receive this email from you regarding my staying home and working. Your memo makes it appear as though I am working from home on a regular basis. As discussed yesterday, this is not the case. Since starting my employment here in August I have spent two days working from home and both of these days were snow days. I had a lot of work to do and realized the evening before the snowstorm that my workload was quite high and I did not want to lo[]se an 8 hour day, so I brought my laptop home with me in case the weather would not permit me to come in. On both these days, as I informed you, I worked on recreating the pages to our website and taking a tutorial on youtube on how to do this. I informed you then that I am aware that working from home on regular days is not part of my job description and I have never done this. The discussion we had was concerning snow days. As there is currently nothing in the personnel policy that states how snow days are to be handled you stated that this would be discussed and voted on at our next meeting and this is on the next meeting agenda. I have no problem with this, as I would like clarification on how to handle snow days. As far as your reminding me that I am in my probationary period, I find this very threatening and uncalled for . . . I am aware that as I have been only working here for 4 months that there will be times when I will need direction on how to do things. I would appreciate this correction being done in a manner that promotes training and education and not in a threatening manner. I would be very thankful to receive advice and information that would make my job easier and in a tone of voice that promotes a positive working environment.

(SR 735.)

On January 2, 2015, Potter replied by email, including the other Supervisors, as follows:

Diane: First and foremost my email was not intended to be threatening, but merely to state the fact that you are a new employee and to document that the issue was discussed. As your immediate supervisor, I found it to be very bad judgment to claim this privilege (working from home) without first seeking permission, irrespective of what the personnel policies say or don't say. I disagree that the context of our conversation was exclusive to snow days. In fact our conversation had as much to do with NRCS office closures around holidays. You will need to verify that the office was closed by Seth [Jones] for "snow days" on the days you worked from home. This is so the Supervisors can keep the issue in context and make the best amendment to the policies.

As for your defensiveness regarding your performance, please remember some of what you accomplished is the result of the Supervisor[s'] decisions and direction I and others provided. Let's give credit where it[']s due. The Probationary Period allows you, the employee, I, your immediate supervisor and we, the Board of Supervisors the opportunity to decide if the person and the position are right for each other. Your email seems to suggest that you are not happy with the level of guidance you're receiving. As far as I know, you have unlimited access to me and the other Supervisors, but, unfortunately, the initiative to communicate needs to come from you because the rest of us are volunteers. This fact was made very clear during your interview.

The reality is that we are all still getting to know each other and we need to work together for the best interest of the organization and the people we serve. Realistically, six months probably is not enough given how infrequently we get to interact. I think things will get better.

(SR 736.)

Charette could have made up any hours that she stayed at home because of snow by working in the office at other times. The Board had approved Houlette to work from home for some period of time on a trial basis because of a family situation. Houlette also worked from home on days when the NRCS office was closed during snow storms. On days that it was snowing but the office was open, Houlette reported to work in the office.

On January 5, 2015, another NRCS employee, Chris Jones, forwarded to Seth Jones and Potter a December 11, 2014, email from Charette. The email was from her personal email address rather than her work email address. Apparently, Charette had received a work-related notification from Chris Jones addressed to her personal email address. Charette wrote in relevant part:

Would you be able to send these notifications to me at [her work email address] instead of Dave Potter. He forwards it to me, but for some reason he's been forwarding it to my home e-mail. You can forward any other info to me at this e-mail rather than to Dave.

(SR 52.) In a January 6, 2015 email addressed to Chris Jones, and including Seth Jones and the other Supervisors, Potter wrote in relevant part:

Did Diane provide you with her home email address and ask that communication be sent there?  Or did she communicate with you via her home email address in the past?  This is unacceptable.  Please let me know. . . . I have <u>never</u> forwarded any [District] business communications to Diane's personal email, as she misrepresents in her email to you . . . It may have happened by mistake but, I don't think so.  I'd like to clear up how you came to use Diane's personal email address for district business.

(SR 51.)  There were no further communications from any party regarding this matter before Charette went on leave.

On January 7, 2015, Potter approached Charette at her desk and sternly asked her where the applicants' files were for her position.  He reminded her to be sure to retain all the applicant files because she was still on probation.

On January 14, 2015, the Board held its regularly scheduled monthly meeting. Charette attended the meeting along with her then-attorney, Ted Smith, and her husband.  At the start of the meeting, Attorney Smith asked to address the Board on Charette's behalf and made a brief statement that Potter had been sexually harassing Charette.[18]  (See SR 252; 651-52.)  Any further direct discussion of the issue was tabled until the end of the meeting.

During the meeting, the Board discussed revisions to the Personnel Policy, a topic which was on the printed meeting agenda as "Personnel Policy Clarification(s)."  (SR 620.)  The revisions, which were moved and seconded by Theriault and Coulombe and adopted by the Board, included:  clarifying that full-time employees, including probationary period employees, are expected to work in the office; adding a provision that the District Coordinator could work from home sixteen hours per year during authorized office closings; adding an Electronic

---

[18] The parties strenuously dispute whether, and to what extent, Charette's attorney described her complaints at the beginning of the meeting, that is, before the Supervisors took various actions, including revising the Personnel Policy. However, for purposes of this Order and taking the record in the light most favorable to Charette, the Court accepts that Charette's attorney briefly mentioned at the beginning of the Board meeting that she was complaining about sexual harassment by Potter.

Communications/Social Media policy; and removing a provision allowing non-probationary employees to take administrative leave based on the administrative leave granted to federal employees.[19]  Potter also recommended a clarification to the Personnel Policy, moved and seconded by Theriault and Coulombe, that benefits are only available to permanent (i.e., non-probationary) full and part-time employees.  The following relevant revisions were made to the text of the Personnel Policy, with additions underlined and deletions noted as such:

> …
>
> Hours/Place of Operation
> A permanent full time employee is expected to work at the place of business during the core office hours of 7:30 am to 4:30 pm, Monday-Friday, unless otherwise authorized by the District Board.  This includes probationary period employees.   Additional hours may be required for travel to meetings, conferences, etc., and will be duly compensated for.
>
> . . .
>
> Electronic Communications/Social Media
> The use of email, FAX and social media is a vital part of the District communication system.  Its use must be done in an appropriate and respectful manner.  All communications to the District's email, Facebook and other accounts are the property of the District.  As such, each Supervisor may access these accounts at any time to monitor activity.  Usernames and passwords shall be made available to all Supervisors and changes shall be immediately reported to the Board Chairman.  Employee use of the District's Facebook page and any other social media is restricted to two hours per week.  This does not apply to email.  Employee use of personal email and social media while at work is prohibited.
>
> …

EMPLOYEE BENEFITS

> The St. John Valley SWCD is committed to providing quality and up to date benefits to all its permanent, full and part-time employees when at all possible.

---

[19] Although the parties do not dispute that the proposal to limit working at home to sixteen hours per year was voted on and approved at the meeting, it is unclear that any language regarding a sixteen-hour limit was added to the Personnel Policy at the time.  Charette contends that Potter was opposed to even allowing sixteen hours of working from home, but the minutes, taken by Charette, record that the final vote for allowing sixteen hours of working at home was unanimous.  (See SR 103.)

The District will provide Social Security Contributions, Workers' Compensation Insurance and State of Maine Vehicle Liability, for work related use only, at no cost to all paid employees. Unfortunately, at this time, employees shall be responsible for their own health, life, dental, disability, and automobile insurance, and that of any dependents, as well as their own retirement package, beyond that of Social Security.

In addition, the following benefits apply to permanent, full-time and part-time employees only and not to any employees during a probationary period: (administrative leave)delete, annual leave, bereavement leave, compensatory time, family and medical leave, holidays, jury duty, leave without pay, military leave, and sick leave. Permanent part-time employees will be compensated on a pro-rated basis.

(Administrative Leave)delete section
All employees will follow the same Administrative Leave as the federal employees who work in the same building. Administrative Leave may be granted for inclement weather conditions, national, state, or local emergencies or other situations as deemed appropriate or necessary.

…

(SR 36-37, 38.)

At the time of the January Board meeting, Potter was considering recommending an extension of Charette's probationary period. As a probationary employee, Charette was not entitled to receive holiday pay, as stated in the Personnel Policy. (See SR 38, 40.) However, Charette had submitted her hours to get paid for holidays and had been paid for Labor Day, Columbus Day, Veterans Day, Thanksgiving, Christmas, and New Year's Day due to an oversight by the Board. When the Board discovered its mistake, they did not ask her to repay the money. If Charette had been entitled to holiday pay during her six-month probationary period she would also have been eligible for holiday pay on Martin Luther King, Jr. Day (January 19, 2015) and Presidents Day (February 16, 2015).

During the January 14th Board meeting, the Board also addressed renewal of the Contribution Agreement with the NRCS. The Contribution Agreement in effect at the time was

due to expire by June 2015 and a signed application to support a new Contribution Agreement had to be submitted by January 16. Under the existing Contribution Agreement, Charette had been working about ten hours per week for the NRCS reorganizing the office. Any new Contribution Agreement would have gone into effect in June 2015, and the NRCS would have paid approximately $5,000 for Charette's work on special projects. This money would have contributed to Charette's salary if the Agreement had gone into effect, but the District had sufficient money in its savings account to cover her salary in full. Even if there was no Contribution Agreement in place, Charette still would have been able to work in the shared office space and answer phones and greet visitors for the NRCS under the separate Operational Agreement. Charette also had enough District work to fill her thirty-two hour work week. In general, the District Coordinator does not have to rely on working on projects for the NRCS to stay busy and has the ability and responsibility to generate her own work, beyond certain standard duties, by initiating ideas for District projects and implementing them. At the time of the January Board meeting, the NRCS was experiencing a reduced workload, but Seth Jones had told Charette there were tasks she was going to be working on later in the year for them.[20]

Charette had worked extensively on the new Contribution Agreement and brought it and the application with her to the Board meeting. She did not previously have authority to sign the Agreement or the application on behalf of the District. Prior to the meeting, someone with the

---

[20] Charette has offered no evidence to dispute the proposition that the NRCS was experiencing a reduced workload. However, Charette testified that Seth Jones had discussed work she could perform under a new Contribution Agreement. (See SR 120-22.) The Court, therefore, does not accept Defendants' assertion that "there was *no additional work* for Charette to perform for the NRCS" once the existing Contribution Agreement expired. (See Statement of Material Facts ¶ 77) (emphasis added). Because the Court can discern some possibility that Charette's testimony about what Jones told her could be admissible at trial, and out of an abundance of caution, the Court DENIES Defendants' request to strike this testimony.

District told Charette that she would be given the authority to sign the application,[21] and her signature line was on the version she brought to the meeting. However, at some point during the meeting, Potter stated that she would not be given signing authority, struck her signature line from the application, and initialed the change, along with Theriault.[22]

When the Supervisors proposed February 2nd for the next monthly Board meeting, Charette asked if they could choose another date because she had scheduled that day to attend an erosion control workshop and pick up her LincPass in Bar Harbor. Because the District laptop did not have an internet connection for some period of Charette's employment, she had to use the NRCS computer for anything requiring an internet connection, including sending emails. She also had a separate NRCS email account for communicating with NRCS staff as part of the work she did for them. The NRCS had allowed Charette to work on their computer without a LincPass, but they had told her that she needed to get a LincPass as soon as possible. Charette had received general approval to attend the erosion control workshop at the September 9, 2014 Board Meeting. (See SR 768.)

The Supervisors suggested that Charette could not go pick up her LincPass on February 2nd because there was "not enough trust yet" (SR 653), presumably between the Supervisors and her, and because the Supervisors were unclear as to who would pay for her travel to Bar Harbor. The meeting minutes indicate that someone raised the question of whether the "NRCS [will] pay for Linc Pass" (SR 104), presumably referring to the cost of Charette's travel considering that there was no other cost involved in picking up the LincPass. Potter asked Seth Jones if the NRCS was

---

[21] Defendants contest that Charette was told she would have signing authority. (See Statement of Material Facts ¶ 202, PageID # 1505.)

[22] Although the record is far from clear and the parties hotly contest this issue, there is some indication that Houlette had some signing authority regarding the District's agreements with the NRCS. (See SR 312.)

willing to pay for Charette's travel and Jones responded that he was confident there would be no issue with the NRCS covering half the cost. The Board did not state that Charette would never be able to obtain a LincPass.[23]

At some point during the January 14th meeting, the Board also requested that Charette provide the Supervisors with her passwords to the District's computer and online sites. Charette refused to provide them her passwords during the meeting because she was concerned that individual Supervisors would be able to access District files outside her presence and that files might be lost or otherwise compromised.

At the meeting's conclusion, Attorney Smith announced that he planned to file a complaint of sexual harassment against the District and Potter and handed each Supervisor a letter with the subject line "Allegations of Harassment and Sexual Harassment." The letter, directly addressed to Potter and signed by Attorney Smith, stated:

> I have been retained and represent Diane Charette concerning issues and allegations of sexual harassment and harassment as defined in the St. John Valley Soil and Water Conservation District Personnel Policy as it pertains to her employment as District Coordinator.
>
> My initial evaluation has revealed evidence of inappropriate conduct by you on more than one occasion causing a hostile or offensive working environment and interfering with Mrs. Charette's work performance.
>
> Consideration will be given to the next steps necessary to prevent any and all harassment. This includes filing a complaint with the Maine Human Rights Commission against the District and individually against you, the Chairman of the Board[.]

---

[23] The Court notes that Charette emailed Brian Vigue, the NRCS State Administrative Officer, the day after the Board meeting, and stated:

> The board did not approve my going down [to Bar Harbor] in February. They want to know if I can pay for this with NRCS contribution agreement funds or if the District will have to pick up the tab. Let me know so I can inform them at our next meeting.

(SR 10.) Vigue replied the next week, after Charette had already gone on leave, that the "NRCS will agree to pay ½ the trip w/ the contribution agreement to obtain your LINCPASS since the computer is used for both NRCS and district work." (SR 11.)

You may wish to provide this notice to the District's liability insurer and your personal insurer to obtain legal representation.

(SR 13.) Attorney Smith also circulated a "Grievance Report," drafted by Charette, in which she detailed the incidents of alleged harassment described above.[24]

In general, portions of the Board meeting were highly contentious. Theriault commented that Charette had "brought [her] bouncer," referring to her husband; Charette's husband called Potter "a fucking prick," threatened Theriault, and led Desjardins to believe that he might strike or grab Potter. (SR 145, 181, 252-53, 297, 375, 379-80, 426.) For the first time in their professional relationship, Theriault and Coulombe became hostile towards Charette and would not look at or speak to her. (SR 145.) Throughout the meeting, Potter mentioned approximately twelve times that Charette was a probationary employee.

After the meeting, Coulombe refused to sign the new Contribution Agreement (or application), telling Charette that "because of this situation I no longer want to do this." (SR 231, 653.) Potter subsequently refused to sign the application, in part because he was "reeling from the complaint." (SR 320, 653.) Theriault also did not sign it. (SR 389.)[25]

Charette had a severe panic attack on January 15, 2015; she thought she was having a heart attack, and her husband took her to the emergency room. The next day, she followed up with her primary care provider, Dr. Silwana Sidorczuk, who diagnosed her with situational anxiety due to her treatment at work and prescribed medication to treat her anxiety and panic attack. Dr. Sidorczuk removed Charette from work, initially for two weeks, but after that continuously until

---

[24] The record is ambiguous as to whether the "Grievance Report" was circulated to the Supervisors at the Board meeting, but, reading the record in the light most favorable to Charette, the Court accepts that it was. The Court, however, cannot determine on this record that the version in the Stipulated Record (SR 740-742) was the version circulated, even considering it is dated January 9, 2015, given that the document went through several drafts over time (see SR 144, 163).

[25] Theriault and Coulombe contend that they did not have authority to sign the Contribution Agreement or application and had not done so in the past. (SR 436, 444.)

Charette's resignation.  Dr. Sidorczuk believed that it was emotionally unsafe for Charette to return to work and be in contact with Potter.[26]

After the January 14th meeting, Desjardins and Smith wrote a letter to Rocque, stating:

We are writing to tell you of recent events that have happened of concern in the District.  As you know, the District has had difficulty maintaining district coordinators.

Earlier, Diane Charette was hired to fill a vacancy.  Since very early in her working for the District, Mrs. Charette shared complaints with both of us and other members concerning statements and conduct by David Potter towards her.  At our monthly meeting on Wednesday night, Mrs. Charette formally advised us of her harassment allegations without any details.  Next week, we are supposed to hold a meeting to discuss the allegations in detail.  We both request your presence at this meeting for guidance and oversight.  Otherwise, we fear Mrs. Charette will not be treated fairly.

Secondly, there has been discussion about obtaining State surplus property so that it may be made available to our region's individuals.  Is this appropriate?

Further, if the property is not used for a period of time, would this property be available for purchase by any directors?

What do we do?

(SR 743.)

The Board scheduled a special meeting on January 21, 2015, with a Maine Assistant Attorney General, to discuss how to respond to Charette's allegations.[27]  Charette and her attorney went to the meeting, but they were not allowed to participate and the Board went into executive session without Charette to discuss the allegations.  During the executive session, Potter agreed to recuse himself from any decisions regarding Charette.  He did not supervise, interact with, or make

---

[26] Because Defendants do not challenge Plaintiff's claimed disability for purposes of their Motions, the Court does not present all the relevant facts concerning Dr. Silwana Sidorczuk's evolving diagnosis and treatment of Charette.

[27] It is unclear if Dave Rocque attended this meeting.

any decisions regarding Charette after that point.  The Board also voted to hire an outside attorney to conduct an investigation into Charette's allegations.

Attorney Anne-Marie Storey contacted Charette's attorney on January 30, 2015, to schedule an interview.[28]  Attorney Storey began her investigation in early February 2015, interviewed nine people, including Charette, and issued a report of her investigation on February 27, 2015, which she provided to counsel for the District.  The report concluded that

> the facts support a finding that the manner of Mr. Potter's interactions with Ms. Charette were at times challenging, abrupt, cold or overbearing and that Ms. Charette felt intimidated by Mr. Potter's conduct on more than one occasion.  This likely contributed to a breakdown of communications between Mr. Potter and Ms. Charette. I find that all of this conduct created an air of distrust and negative feelings between certain members of the Board and Ms. Charette.

(SR 83.)   The report did not make any specific findings regarding illegality, sexual harassment, discrimination, or hostile work environment.  Potter was never disciplined.  Charette was never told anything about the results of the investigation or given a copy of Attorney Storey's report despite multiple requests in the ensuing months.

After some informal communications, counsel for the District wrote Charette's attorney with the following return-to-work offer on May 7, 2015:

> I am writing in follow up to our telephone conversation on April 30, 2015.  As you are aware, the investigation of Ms. Charette's complaints has been completed.  At its meeting on April 29, 2015,[29] the Board authorized me to convey to you that, effective immediately, Peter Smith will be the direct supervisor of the District Coordinator position held by Ms. Charette.  The Board amended its Personnel Policy (Supervision Section, page 13) accordingly.  As we discussed, Mr. Potter

---

[28] The Court assumes that Plaintiff failed to either admit, deny, or qualify this relatively inconsequential fact due to a typographical error.  (See Statement of Material Facts ¶ 94, PageID # 1459); see also D. Me. Loc. Rule 56(f) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.")

[29] Defendants claim, and Plaintiff admitted, that "[t]he Board did not hold meetings in February, March, April or May 2015."  (Statement of Material Facts ¶ 99.)  However, the May 7, 2015, letter suggests, at the very least, that the Board held some type of meeting in April.

remains Chair of the Board and would be present at Board meetings and involved in other official business. He would not be the direct supervisor under this arrangement. . . . It is anticipated that this arrangement will be in place for a trial period of three months, at which time it would be evaluated.

(SR 15.)

Around the time of the January 14th Board Meeting, on the recommendation of Desjardins, Charette's attorney had emailed Rocque detailing Charette's allegations concerning Potter. On May 26, 2015, Rocque sent an email to the Supervisors stating that he wanted to schedule a meeting for June 2, 2015, which would include Charette, on the topic of Board functionality. Potter responded in an email including the Supervisors, Seth Jones, and District counsel, and stating, in relevant part:

> I appreciate your effort and concern regarding Board functionality. I, as you know, expressed this same concern . . . back in January. . . .
>
> Now, 4-1/2 months later you want to have this meeting to discuss board functionality and you want Diane to attend. Something doesn't smell right. I think at the very least this meeting should be held after Diane is well enough to return to work. An offer was made to her over a month ago to return to work and as of today there has been no response from her attorney. I understand Diane is collecting workers' compensation for job related stress . . . she continues to be unable to return to work. Will she recover more quickly if the outcome of this meeting is favorable to her? Will she continue to be disabled if the outcome is not favorable to her? I'm having a hard time understanding what possible benefit will come from this approach.
>
> I do know this. The majority of the Board members believe that Diane is the wrong person for the position. Diane (workers' comp) and Gene [Desjardins] (retired) both collect checks and have unlimited time to prepare for this meeting. Most of the Board members are employed and will have worked an exhausting 12 hour day before the proposed meeting and will have little opportunity or inclination to prepare. This does not seem equitable. I have been a board member for about 8 years and in the last year donated an unbelievable amount of time to the District with great support and appreciation from the Board and none from DACF, [the Maine Association of Conservation Districts], etc. I will not commit to attend a meeting that will likely amount to a set up by my enemies. Maybe I will attend and preside. Maybe not.

I would rather suggest a retreat-like format in a neutral location that will help ease some of the tension among Board members and on a day when most of us don't have to show-up tired after a long day. I'm willing to set up such a meeting. Please think about this. I apologize for any inconvenience, but after having time to think about this, I think this approach would be more productive.

(SR 747.)

The Board held a meeting on June 2, 2015, which the District's counsel attended, on the subject of general Board functionality going forward. Charette and her attorney attended, but her complaints were not addressed and she was not asked to speak. Theriault stated during the meeting that he had never wanted Charette in the District Coordinator position. (SR 655.)

In an email dated June 3, 2015, and addressed to the District's counsel, Charette's attorney wrote:

I attended last night's meeting in Fort Kent expecting, as did others, to resolve [Charette]'s work situation. Instead, the topic was sidestepped.

David Potter, an appointed Supervisor, created a hostile work environment for Mrs. Charette and still fails to acknowledge his misconduct, instead, blaming her for any District dysfunction.

Mrs. Charette is interested in returning to work, but is concerned, especially when Mr. Potter proclaims the majority of the Board do not want her for the job. Attempts to scare her off have only resulted in an injured employee. What is next?

Mrs. Charette will still face some form of harassment, but most likely in more sophisticated methods. She will still be subject to personnel policies that were modified specifically to retaliate against her and would request her job duties and personnel policies revert back to the policies in place before Mr. Potter's changes.

Mrs. Charette is uncomfortable that the results of a comprehensive investigation conducted by [Storey] are concealed from her.

What, if any, disciplinary action was/or will be taken to prevent future misconduct? Her situation upon return to work is ripe for retaliation.

Also partially raised at last night's meeting was Mr. Potter's ability to vote on issues concerning Mrs. Charette. To me, it is fraught with bias and a clear conflict of interest. Having this issue addressed would give Mrs. Charette some security that the "majority" of Board members would not terminate her upon her return.

(SR 16.)  On June 16, 2015, Charette filed an Intake Questionnaire with the Maine Human Rights Commission alleging unlawful sexual harassment, whistleblower discrimination, and retaliation by Potter, Theriault, and Coulombe, which was forwarded to the three Supervisors on that date.

In a letter dated June 26, 2015, District counsel wrote to Charette's new attorney, John Gause, in response to Attorney Smith's June 3rd email.  In relevant part, the letter reiterated the District's May 7th return-to-work offer and stated that the District would assume that Charette had rejected the offer if she did not respond by July 17.  The letter also stated that Charette would not be provided with the Storey report because the District contended that it was confidential under Maine law.  (SR 49-50.)

> In a letter dated July 14, 2015, Attorney Gause advised District counsel:
>
> Diane has a mental disability that prevents her from having contact with Chairman David Potter.  For that reason, she is asking for a reasonable accommodation that she not have contact with him after she returns to work.  Even if Diane's direct supervisor were changed from Chairman Potter to Peter Smith, her job would still require her to have regular contact with Chairman Potter.  [The May 7th offer] states, "Mr. Potter remains Chair of the Board and would be present at Board meetings and involved in other official business."  Therefore, Diane is medically unable to return to work under the arrangement proposed in [the] letter.

(SR 17.)  Attorney Gause also requested "a copy of the current personnel policy (including the date of its revision), the personnel policy as revised in May 2014, and the personnel policy as it existed before the May 2014 revisions." (Id.)[30]  Finally, Attorney Gause expressed skepticism that the District could not share the Storey report on the basis of Maine confidentiality law and wrote

---

[30] Throughout the correspondence in the record, Charette's counsel repeatedly requested the revisions to the District Personnel Policy.  However, the two sides were talking past each other on this issue.  Charette's counsel appears to have requested revisions from May 2014, which would have been before Charette was hired, and the District eventually provided Charette's counsel only with the revision made after Charette went on leave stating that the District Coordinator could be supervised by someone other than the Board Chair.

that Charette "needs some assurance that her complaints were taken seriously, appropriate discipline was imposed, and further harassment will not occur." (Id.)

In a letter dated August 3, 2015, District counsel requested information and documentation to support Charette's request for reasonable accommodation. Counsel reiterated the District's position that the Storey report is confidential but assured Attorney Gause that Charette's concerns were taken seriously, her claims were promptly investigated, and that "Chairman Potter has recused himself from any decision making relating to Ms. Charette's status." (SR 19.) This was the first time Charette was explicitly notified that Potter had recused himself from any decisions regarding her employment.

On August 25, 2015, Attorney Gause provided the District with Charette's completed request for reasonable accommodation, which requested only one reasonable accommodation, that Charette not have any contact with Potter: "Accommodations that would not involve Mr. Potter to be directly or indirectly involved in patient's work." (SR 25.) The form from Dr. Sidorczuk also included the observation that "any thought of possible contact with Mr. Potter makes patient have panic attacks and severe anxiety. She cannot work in the same place and be[] [in] constant fear that Mr. Potter can appear at any time . . . ." (SR 24.)

In a letter dated October 21, 2015, District counsel responded to the reasonable accommodation request with the following proposal:

> Ms. Charette would return to her position as District Coordinator, with Peter Smith as her supervisor (as previously offered). She would be excused from attending Board meetings. Ms. Charette would work 3 days (20 hours) per week. Any necessary communications with the Board Chair would be handled by a second individual (who will work the two days per week Ms. Charette does not work and who will attend the Board meetings), who has been filling in for Ms. Charette on a temporary basis through an agency. It is anticipated that this arrangement would be in place for a trial period of two months, at which time it would be evaluated.

(SR 28.)

In an October 30th email, Attorney Gause responded as follows:

Diane does have serious concerns about the District's offer to return her to work in a shared position in which her hours would be reduced from 32 to 20 hours per week. She was hired as the only District Coordinator in a 32-hour per week position. Her hours and job responsibilities should not be substantially changed as a part of the reasonable accommodation process. Not only does she depend on the 32 hours for financial reasons, but she is concerned about what would happen to her benefits, vacation, sick pay, and holiday pay if she accepted less hours, including her potential eligibility for health benefits if those are offered in the future. She is also concerned about how it would work logistically to have two people share the same position. How would the job responsibilities (other than attending the board meetings) be divided? I understand that, prior to Diane being hired, two people shared the District Coordinator position, which did not work out.

Instead of having her hours cut and sharing the position, Diane would like to continue to work 32 hours per week as the only District Coordinator. To avoid interaction with Mr. Potter, she could meet with her supervisor, Peter Smith, each month prior to the scheduled board meetings, and Mr. Smith could relay information between Diane and the Board. Please let me know if this arrangement would be acceptable.

(SR 29.)

Charette saw Dr. Sidorczuk on November 19, 2015, and described the District's latest return-to-work offer. Dr. Sidorczuk did not believe that Charette was medically able to return to work under that proposal because Potter would still have been indirectly involved with Charette in his capacity as Chair; for example, Smith, Charette's direct supervisor, would himself have reported to Potter. Dr. Sidorczuk thought it would be necessary for Potter to be "totally out of the picture." (SR 783-84.) Dr. Sidorczuk also believed it was important for Charette to receive the results of the Storey investigation in order to be able to return to work.

The record is unclear as to each individual Supervisor's feelings about the District's return-to-work offer and Charette's October 30th counterproposal. Smith was willing to serve as Charette's direct supervisor on a temporary basis but expressed concern that the arrangement would be a burden because he lived an hour away from the District office. (SR 360.) In any event, the Board ultimately did not formally vote to accept Charette's counterproposal.

On November 23, 2015, District counsel emailed Attorney Gause and stated that the Board was willing to proceed with its October 21, 2015, offer with the additional agreement that any benefits would be prorated based upon the number of hours Charette worked. Charette declined the District's offer and instead resigned from her position as District Coordinator on December 8, 2015. Her resignation letter stated:

> After careful consideration, I feel it is time for me to officially resign as the District Coordinator for the St. John Valley Soil and Water Conservation District.
>
> In November of 2014, the working environment at the District office became a hostile working environment. In an effort to correct the situation that I was working under, I reported the situation to the NRCS staff, the District Board and also to Dave Rocque and Attorney Ted Smith. However, the situation worsened when some of the Board Supervisors retaliated after the situation was brought to their attention. Over the past year, I have remained hopeful for a positive resolution to the situation that exists at the SJVSWCD. However, recently I have reviewed the offer that the District has made in order for me to be able to return to work. After careful review of the job offer and the documents attached with that offer,[31] I am aware that the issues I had discussed during the investigation for harassment have not been addressed nor resolved. These unaddressed and unresolved issues leave me feeling it is unsafe for me to return to work.
>
> Due to the physical and emotional distress caused by these ongoing issues, I find myself forced to submit my resignation at this time to preserve my well-being and quality of life.
>
> In closing, I want to state that the duties and responsibilities given to me as the District Coordinator were ones that I truly enjoyed and I will greatly miss. I want to especially thank Gene Desjardins and Peter Smith for standing by me during this past year. I am sorry to have to leave such a wonderful position, but I am no longer able to endure the ongoing stress caused by the unresolved issues that continue to exist at the District.

(SR 46.)

---

[31] This is an apparent reference to the attachment of the Personnel Policy revision providing that the District Coordinator could be supervised by someone other than the Board Chair.

On December 23, 2015, District counsel wrote to Attorney Gause requesting that Charette reconsider her resignation and notify the Board of her decision by December 30. She did not reconsider her decision. Charette has been unemployed since she resigned from the District.

In June 2015, the District had again retained the services of Tardif, who was employed and paid by a temporary employment agency, Tempo Employment Services. During his time with the District from June 2015, Tardif performed the majority of the essential functions of the District Coordinator position and there were minimal differences between his job duties and Charette's prior to her leave of absence.[32] Potter, Theriault, and Coulombe had minimal in-person interactions with Tardif and only occasionally visited the office. To the extent they did interact with Tardif, they treated him courteously, without any similar issues as experienced by Charette. Potter and Tardif also got along well during Board meetings, Tardif did not complain about Potter, and they did not have any disagreements.[33] Smith believes that Charette's and Tardif's job performances were comparably excellent. At some point during Tardif's time with the District, the Supervisors approved a $1,500 upgrade to the computer system. There was no District-NRCS Contribution Agreement in effect between June 2015 (when the existing agreement expired) and the spring of 2017. Charette filed the present suit in this Court on January 30, 2017.

---

[32] Defendants contest that Tardif essentially performed the District Coordinator job while Charette was on leave. (See Statement of Material Facts ¶¶ 13-15, 238.)

[33] The record is unclear as to Potter's status as Board Chair or Supervisor, or the extent of his participation with the District, in the months after Charette took leave. In any event, the parties have not used the record to illuminate this issue or suggested that the Court's analysis of the relevant legal issues should be informed by Potter's status with the District or the likelihood at the time Charette was on leave that he would be retained as Board Chair or Supervisor.

## III.    DISCUSSION

The following claims remain pending in this matter following the Court's Order on Defendants' Motions to Dismiss (ECF No. 27): Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634, against the District (Count I); Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, against the District (Count VI); Equal Protection against David Potter (Count IX); Equal Protection against Duane Theriault (Count X); Equal Protection against Kurt Coulombe (Count XI); First Amendment against Potter (Count XII); First Amendment against Theriault (Count XIII); and First Amendment against Coulombe (Count XIV).

### A.    MHRA against the District (Count I)

In Count I of the Second Amendment Complaint, Charette alleges that the District violated the MHRA by (a) discriminating against her because of her sex; (b) subjecting her to a hostile work environment because of her sex and because she engaged in activity protected under the MHRA and the Whistleblowers' Protection Act; (c) constructively discharging her because of her sex, because of her disability, and because she engaged in activity protected under the MHRA and the Whistleblowers' Protection Act; (d) retaliating against her because she engaged in activity protected under the Whistleblowers' Protection Act, because she opposed practices that would be a violation of the MHRA, and because she asserted her rights under the MHRA.  (Second Amended Compl. ("Compl.") (ECF No. 19-1), PageID #s 227-28.)[34]

### i.    Sex Discrimination

To make out a prima facie case of sex discrimination under the MHRA, a plaintiff must show "(1) that she is a member of a protected class; (2) that she performed her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that she was treated differently

---

[34] The Second Amended Complaint is the operative pleading in this matter.  (See ECF No. 27.)

from similarly situated men." Berry v. City of S. Portland, Me., 525 F. Supp. 2d 214, 228 (D. Me. 2007).[35] "Adverse employment actions" are those that "affect employment or alter the conditions of the workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006). Such actions "typically involve[] discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). In other words, "[t]o be adverse, an action must *materially* change the conditions of plaintiffs' employ." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) (emphasis added). "A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Morales-Vallellanes, 605 F.3d at 35 (quotation marks omitted). Further, the question of what constitutes a legally cognizable adverse action "must be cast in objective terms" because "[w]ork places are rarely idyllic retreats, and the mere fact than an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996).

In general, "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry." Blackie, 75 F.3d at 725. "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of

---

[35] The Court cites to case law construing Title VII of the Civil Rights Act of 1964 throughout its discussion of Plaintiff's MHRA claims because "Maine courts look to Title VII case law in construing the MHRA." Gavrilovic v. Worldwide Language Res., Inc., 441 F. Supp. 2d 163, 177 (D. Me. 2006).

considering her for promotion after a particular period of service." Id. (citations omitted). To provide some examples, a job transfer may be an adverse action "if it materially changes the plaintiff's conditions of employment in a manner that is more disruptive than a mere inconvenience or an alteration of job responsibilities" or if it "involve[s] a demotion in form or substance." Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 61 (1st Cir. 2018) (quotation marks omitted); see also Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) ("[R]eassignment with significantly different responsibilities may be actionable.") (quotation marks omitted). In contrast, the loss of three shifts on holiday weeks in a workplace with fluctuating schedules is not an adverse action. Cham v. Station Operators, Inc., 685 F.3d 87, 94-95 (1st Cir. 2012).

Reprimands, including written warnings regarding workplace behavior, are not adverse actions if they do not carry any "tangible consequences." Bhatti v. Trs. of Boston Univ., 659 F.3d 64, 73 (1st Cir. 2011). Similarly, heightened supervision will not necessarily satisfy the adverse action prong. See Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 25 (1st Cir. 2002) ("extreme supervision," where supervisors watched the employee while she did her filing and stood behind her while she talked on the phone, did not constitute adverse action). Because of the objective nature of the inquiry, "[i]t is not enough that [the plaintiff] felt stigmatized and punished" by an employer's actions. Id. In the absence of a "tangible change in duties or working conditions," expressions of "intensified personal animus, hostility, disrespect, and ostracism" against the employee do not necessarily amount to adverse action. Id. (quotation marks omitted). Finally, the "apparently routine application of pre-existing [employer] policy to [an employee] cannot be construed as adverse employment action." Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir. 2002).

Plaintiff contends that the following actions taken by the Supervisors constitute adverse actions for purposes of her sex discrimination claim:

- On November 17, 2014, Potter refused to sign her payroll check, something he had done previously[;]
- During the January 14, 2015, meeting, Potter and Theriault refused to allow Charette to go to Bar Harbor to pick up her LincPass and attend an erosion control workshop on February 2, 2015, which had been previously scheduled[;]
- During the January 14, 2015, meeting, Potter and Theriault removed Charette's signing authority for the application for the Contribution[] Agreement between NRCS and the [District;]
- During the January 14, 2015, meeting, Potter recommended, Theriault and Coulombe seconded, and the Board approved changes to the personnel policy that prohibited Charette from working at home[;]
- During the January 14, 2015, meeting, Potter recommended, Theriault and Coulombe seconded, and the Board approved changes to the personnel policy that eliminated Charette's right to administrative leave when she became a permanent employee[;]
- During the January 14, 2015, meeting Potter recommended, Theriault and Coulombe seconded, and the Board approved changes to the personnel policy that prohibited Charette from using her personal email at any time while at work[;]
- During the January 14, 2015, meeting Potter recommended, Theriault and Coulombe seconded, and the Board approved the elimination of at least two of Charette's paid holidays as a probationary employee[; and]
- After the meeting, Potter and Coulombe refused to sign the application for the NRCS Contribution Agreement . . . and a new Contribution Agreement was not executed during Charette's employment.

(Pl.'s Response (ECF No. 69), PageID #s 1610-11.)

Based on the record before the Court, no reasonable factfinder could conclude that any of these examples constitute "adverse actions." The record does not support that Potter "refused" to sign Plaintiff's paycheck on November 17, 2014, only that Charette needed to have Coulombe sign her paycheck on that day. Any minor delay and inconvenience Plaintiff experienced in getting her check signed did not materially affect her employment. To the extent the Supervisors delayed Plaintiff's trip to get her LincPass and caused her to miss an erosion control workshop, this also did not constitute adverse action. There is no evidence in the record that missing the erosion

control workshop had any bearing on her employment.  Nor is there support in the record for the contention that a delay in getting her LincPass materially affected her employment.  Although the NRCS was encouraging her to get a LincPass as soon as possible, she had been allowed to use the NRCS computer without one, and there is no indication in the record that she was going to be denied access to the NRCS computer while the District and the NRCS negotiated which entity would cover her travel costs.

The changes to the Personnel Policy likewise did not constitute adverse actions.  Regarding working at home, there is nothing in the record to support that Plaintiff was actually authorized to work at home before the "clarification" to the policy, or that working at home was a customary benefit of the position as opposed to a special arrangement with a previous employee.  Regarding administrative leave, the change to the policy would only have affected Charette if she became a permanent employee.  As a probationary employee, she was never entitled to administrative leave considering that the pre-revision policy language provided, "the following benefits apply to *permanent, full-time and part-time employees only*: administrative leave . . . ."  (See SR 38) (emphasis added.)  Considering that there was no guarantee that Charette was going to become a permanent employee, and she had no right to expect that she would become a permanent employee, no reasonable factfinder could conclude that her employment was materially affected by the change.  Further, there is no clear evidence in the record that Charette's employment would have been materially affected by the change even if she became a permanent employee considering the policy revision allowing the District Coordinator to work at home up to sixteen hours per year.  Regarding the prohibition on the use of personal email at work, there is simply no evidence in the record to support that this materially affected Plaintiff's employment and Plaintiff has not articulated that the email prohibition materially affected her in any way.

Finally, the circumstances surrounding the Contribution Agreement do not amount to adverse actions. Considering the record in the light most favorable to Plaintiff, she was told that she could sign the application, but the Supervisors then rescinded this authorization and refused to sign the application. This would have resulted in the Contribution Agreement lapsing and Plaintiff losing the ability to work on special projects for the NRCS. However, no reasonable factfinder could conclude that the pending absence of a Contribution Agreement materially affected Plaintiff's employment. Even if Charette had remained in the District's employ after the Contribution Agreement lapsed, the record supports that she would have still been paid her salary, would still have had sufficient work, and would still have been able to perform office tasks for the NRCS. Simply put, the record supports that the absence of a Contribution Agreement would have only resulted in a shift in job responsibilities without any cognizable negative impact on Charette's employment, career development, or prospects for career advancement. See Caraballo-Caraballo, 892 F.3d at 61-62.

    ii.     Hostile Work Environment

Plaintiff also contends that she was subjected to a hostile work environment. To make out a hostile work environment claim under the MHRA, "the plaintiff must show: (1) she is a member of a protected class; (2) she was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability." Flood v. Bank of Am. Corp., 780 F.3d 1, 10 (1st Cir. 2015). Generally, "[p]ervasiveness and severity are questions of fact." Id. at 11.

To determine whether harassment was sufficiently severe or pervasive to support a hostile work environment claim, courts consider on a case-by-case basis "numerous factors (to which we assign no particular determinative weight) [including] severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance." Franchina v. City of Providence, 881 F.3d 32, 46 (1st Cir. 2018); see also Doyle v. Dep't of Human Servs., 824 A.2d 48, 56 (Me. 2003). It is clear, however, that "[o]ffhand comments and a tense or uncomfortable working relationship with one's supervisor are, without more, insufficient to support a hostile work environment claim." Flood, 780 F.3d at 12. "[I]solated incidents (unless extremely serious)" also do not support a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). In short, "conduct must be extreme to amount to a change in the terms and conditions of employment" supporting a hostile work environment claim. Id.; see also Marrero, 304 F.3d at 19 ("[T]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.") (quotation marks omitted). "Properly applied," the standards for determining whether a working environment was hostile, "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788 (quotation marks omitted).

Plaintiff contends that the purported "adverse actions" outlined above, see supra p. 38, plus additional actions taken by the Supervisors "when taken together, created a 'hostile work environment.'" (Pl.'s Response, PageID # 1615.) Specifically, Plaintiff points to the following additional comments and actions:

- On November 12, 2014, Potter angrily told Charette, during a public meeting, "I suppose now you're going to start telling me how to do my job."

41

- On November 13, 2014, Potter yelled at Charette in a threatening manner while accusing her of taking personnel files and lying about it.
- Potter became more hostile and scrutinizing of Charette's work after she complained.
- On December 18, 2014, Potter derided Charette to the Assistant Supervisor, and refused her request for a software update.
- On December 29, 2014, Potter was overly critical of Charette's use of snow days.
- On December 30, 2014, Potter chastised Charette to the other Supervisors and misrepresented information about her, including implying that she was lying.
- On January 7, 2015, Potter threatened Charette's job for the fourth time since she started her employment.
- On January 14, 2015, during the Supervisors' board meeting, Potter threatened Charette's employment approximately twelve times.
- During the meeting, Potter, Coulombe, and Theriault also decided Charette would be required to disclose her computer password to the Supervisors so that they could access her computer whenever they wanted.
- During the meeting, Theriault and Coulombe became hostile toward Charette for the first time.
- Defendants Potter, Coulombe, and Theriault repeatedly stifled Charette's efforts to raise during Supervisors' meetings her complaints about her mistreatment.
- On May 26, 2015, Potter publicly ridiculed Charette and stated that, "[t]he majority of the Board members believe that Diane is the wrong person for the position."
- On June 2, 2015, Theriault publicly stated that he never wanted Charette in her position.

(Pl.'s Response, PageID #s 1612-13) (citations and footnote omitted). Although not included in this list, Plaintiff also surely relies on Potter's comment that Plaintiff would not get her way with him even if she were to "dance naked."

The Court assumes favorably to Plaintiff that her treatment by Potter was to a cognizable extent based on her sex. Although only one incident, Potter's "dance naked" comment, was explicitly sex-based, it is abundantly clear that "where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim." O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).[36] The

---

[36] A sexual harassment or sex-based hostile work environment claim "does not require evidence of overtly sexual conduct." Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 216 (1st Cir. 2016). However, in this case, a

crucial question, then, is whether Plaintiff has alleged treatment that was sufficiently severe or pervasive to support a hostile work environment claim. As the First Circuit recently emphasized, "[s]ubject to some policing at the outer bounds, it is for the jury to . . . decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Martina Rivera-Rivera v. Medina & Medina, Inc., No. 17-1191, 2018 WL 3640821, at *6 (1st Cir. Aug. 1, 2018) (quotation marks omitted). On the record presented, the Court determines that Charette's hostile work environment claim is not so marginal that it can be decided by the Court on summary judgment and, therefore, should be left to a jury.[37]

iii.    Constructive Discharge

Plaintiff also contends that she was "constructively discharged," that is, forced to resign because of her treatment by the Supervisors. "Constructive discharge" is not a stand-alone cause of action but a way of satisfying the adverse action element of an employment discrimination claim. See Levesque v. Androscoggin Cty., 56 A.3d 1227, 1229 (Me. 2012) ("In Maine, a plaintiff may use the doctrine of constructive discharge to satisfy the elements of 'discharge' or 'adverse employment action' in an otherwise actionable claim pursuant to [the MHRA].") An employee is constructively discharged if "the working conditions imposed by the employer," whether through discriminatory action or the creation of a hostile work environment, "had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt

_____

reasonable factfinder could readily conclude that the "dance naked" comment was overtly sexual or sex-based. On the other hand, cases involving a pattern of sexually overt comments or conduct are entirely inapposite to the matter before this Court.

[37] Given that Plaintiff has presented a triable claim of hostile work environment involving contested facts, any application of the "Faragher/Ellerth" affirmative defense also presents triable issues that cannot be decided on summary judgment based on the record before this Court. See Burns v. Johnson, 829 F.3d 1, 18-19 (1st Cir. 2016) (describing the affirmative defense).

*compelled* to resign," Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (emphasis added), and the employee did in fact resign because of the intolerable conditions, Sullivan v. St. Joseph's Rehab. & Residence, 143 A.3d 1283, 1288 (Me. 2016). This means that "[c]onstructive discharge usually refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (quotation marks omitted); see also Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) ("Toiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome, but Title VII does not protect employees from the ordinary slings and arrows that suffuse the workplace every day.") (quotation marks omitted). Put differently, an employee is constructively discharged if her decision to resign is "effectively . . . void of free choice or will" because "the employer's actions [have] effectively vitiate[d] the employee['s] power to choose work over retirement." Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008) (quotation marks omitted). "The standard is an objective one; an employee's subjective perceptions do not govern." Lee-Crespo, 354 F.3d at 45. Finally, the constructive discharge standard sets a higher bar for a plaintiff than demonstrating a hostile work environment. Marrero, 304 F.3d at 28 ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.") (quotation marks omitted).[38]

There is an additional consideration of relevance to this matter; "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints and whether it was likely that the harassment would continue." Lee-Crespo, 354 F.3d

---

[38] The First Circuit recently made clear that repeated statements that an employee *will be fired* may support a claim for constructive discharge. Martina Rivera-Rivera v. Medina & Medina, Inc., No. 17-1191, 2018 WL 3640821, at *10 (1st Cir. Aug. 1, 2018). Although Plaintiff was repeatedly reminded of her probationary status, the Court does not consider these reminders akin to the statements that supported a constructive discharge claim in Rivera-Rivera.

at 45; see also Marrero, 304 F.3d at 28 ("An employee's assessment of whether she can remain at work while pursuing remedies for the harassment she has endured obviously will be affected by the likelihood that the harassment will continue unabated.")  The fact that an employer takes steps to address the employee's complaints undercuts a claim of constructive discharge.  Lee-Crespo, 354 F.3d at 45-46.

Plaintiff's claim of constructive discharge fails even if she was otherwise subject to harassment.  The record supports that the District was taking steps to abate any future harassment by offering to change Plaintiff's supervisor, limit her contacts with Potter, and assess the changes going forward.  No reasonable factfinder could conclude that Plaintiff was *compelled* to resign where she was offered a credible alternative work arrangement on a trial basis to address the harassment and did not even give the arrangement a try.  See E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014) ("[A] reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her.").[39]

    iv.    Retaliation

Plaintiff presents two separate theories of retaliation: a) that she was retaliated against generally for opposing practices in violation of the MHRA, and b) that she was retaliated against for "whistleblowing activity," within the meaning of the Maine Whistleblowers' Protection Act

---

[39] The Court notes that "[i]f a plaintiff does not resign within a reasonable time period after the alleged harassment, [she] was not constructively discharged."  Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000).  Courts have determined that a gap of as little as six months between the alleged harassment and the resignation may vitiate a constructive discharge claim.  See Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991) (six-month gap); Landrau-Romero, 212 F.3d at 613 (seven-month gap); see also Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 26 (1st Cir. 2013) ("Here Gerald voluntarily resigned from the University . . . a little over a year after the final act of harassment and eight months after she was transferred . . . Her resignation came too late after the offensive conduct and reassignment to be labeled a constructive discharge.").  However, the Court does not consider the timing of Plaintiff's resignation to be particularly germane.  It stands to reason that an employee who takes leave because of intolerable work conditions could be constructively discharged at any point at which it becomes objectively clear that the intolerable conditions are not being addressed.

("WPA"), 26 M.R.S.A. §§ 831-840.  Both theories require her to establish (1) that she engaged in protected activity; (2) that she suffered a materially adverse action or was adversely affected; and (3) that there was a causal connection between the protected activity and the adverse action. Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1090 (Me. 2012).[40]

It is unlawful employment discrimination for an employer "to discriminate in any manner against any individuals because they have opposed a practice that would be a violation of" the MHRA.  5 M.R.S.A. § 4572(1)(E).  The employee must only show that she had a reasonable belief that the conduct she opposed was in violation of the MHRA, not that the conduct was in fact unlawful.  See Bowen v. Dep't of Human Servs., 606 A.2d 1051, 1054-55 (Me. 1992) (explicating a Title VII retaliation claim); see also Curtis v. Sullivan Tire, Inc., 584 F. Supp. 2d 204, 212 (D. Me. 2008) (applying Bowen to an MHRA retaliation claim).  At the summary judgment stage, there must be trialworthy evidence that any alleged retaliation was the result of a complaint tied to one of the MHRA's protected categories, such as sex.  See Stinson v. Simplexgrinnell LP, 394 F. Supp. 2d 280, 281 (D. Me. 2005) (dismissing a complaint because the plaintiff did not allege that she complained to her employer that she was being subjected to a hostile work environment *based on her sex*).

Under the WPA, "[n]o employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because" the employee engaged in protected activity.  26 M.R.S.A. § 833(1).  Of relevance to this matter, protected activity includes, (1) making a good faith report to the employer

---

[40] "Because the WPA does not itself provide a judicial remedy, there is no direct cause of action pursuant to the WPA. However, the MHRA provides a direct cause of action for employees alleging discrimination based on WPA-protected whistleblowing activity. . . ."  Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1090 (Me. 2012) (citations, footnote, and quotation marks omitted).

regarding what the employee has reasonable cause to believe is a violation of law; (2) making a good faith report to the employer regarding what the employee has reasonable cause to believe is a condition or practice that would put the employee's health or safety at risk; or (3) refusing in good faith to "carry out a directive to engage in activity that would be a violation of law . . . after having sought and been unable to obtain a correction of the illegal activity or dangerous condition from the employer." 26 M.R.S.A. § 833(1)(A), (B), (D).

An adverse action in the context of a general MHRA retaliation claim means an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 57. This includes subjecting the employee to a hostile work environment. Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005). Adverse action in the context of a WPA retaliation claim means action "that materially changes the conditions of an employee's employment." Sullivan, 143 A.3d at 1288.[41] However, "threats by an employer against the employee's status of employment, whether or not the threats are actually

---

[41] The Court recognizes that there is some tension between the language of the general retaliation provision of the MHRA and the specific retaliation provision of the WPA (or "MWPA"). This tension was well explicated by another Judge of this Court:

> Maine courts have adopted the language of section 833 with regard to all three elements of an MWPA action even though section 4572, which is the conduit for an MWPA action, defines adverse employment action differently than section 833. Section 833 limits adverse employment action to discharging, threatening, and otherwise discriminating "against an employee regarding the employee's compensation, terms, conditions, location[] or privileges of employment;" section 4572 has a broader scope, defining unlawful employment discrimination as "to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions, or privileges of employment or any other matter directly or indirectly related to employment" because of an employee's protected activity. 5 M.R.S. § 4572. The clause, "any other matter directly or indirectly related to employment," contemplates a broader scope of employer conduct that could be considered adverse employment action. It is uncertain how this language applies to MWPA claims, but since section 4572 is the provision providing a right of action to whistleblowers, the Court is reluctant to view it as surplusage.

Thayer Corp. v. Reed, No. 2:10-CV-423-JAW, 2011 WL 2682723, at *21 (D. Me. July 11, 2011) (footnote and citation omitted). However, rather than seeking to solve this ambiguity, this Court follows the prevailing case law, which outlines different standards for evaluating retaliation claims based on statutorily defined whistleblowing activity on the one hand and general opposition to practices in violation of the MHRA on the other.

acted upon, can constitute adverse employment actions" for purposes of a WPA retaliation claim. Donato v. Granite Bay Care, Inc., 2:17-CV-145-NT, 2017 WL 3485559, at *2 (D. Me. Aug. 14, 2017) (quotation marks omitted); LePage v. Bath Iron Works Corp., 909 A.2d 629, 636 (Me. 2006) ("The plain language of the [WPA] includes threats, but only those regarding the employee's compensation, terms, conditions, location or privileges of employment.") (quotation marks omitted); see also 26 M.R.S.A. § 833(1) (stating that "[n]o employer may discharge, *threaten* or otherwise discriminate against an employee" because of whistleblowing activity) (emphasis added). Both general MHRA and WPA retaliation claims require "but-for" causation, meaning that the adverse action must have been substantially motivated by the employee's protected activity. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 349 (1st Cir. 2018) (WPA); Ramsdell, 992 F. Supp. 2d at 21 (MHRA).

If the plaintiff has made out a prima facie case of retaliation, a court applies the well-known McDonnell Douglas burden-shifting framework to determine whether any non-retaliatory reason for the adverse action offered by the employer is pretextual. See Richard v. RSU 57, 296 F. Supp. 3d 274, 277 (D. Me. 2017), appeal docketed, No. 17-2200 (1st Cir. Dec. 7, 2017) (collecting cases applying the McDonnell Douglas burden-shifting framework to retaliation claims).[42]

Plaintiff contends that she was retaliated against based on her complaints concerning sexual harassment and discrimination and her comments regarding the District's potential participation in the surplus property program. (See Pl.'s Response, PageID #s 1622-23, 1626-27.) The Court

---

[42] As this Court recently explained, "[t]o the extent the application of McDonnell Douglas burden-shifting to WPA retaliation claims is an open question, the bottom-line is that a Court must still consider 'whether the record, construed in the light most favorable to [the non-moving party], suffice[s] to support an inference that the adverse employment action was motivated at least in part by protected activity.'" Morin v. Hannaford Bros. Co., LLC, No. 1:17-CV-50-GZS, 2018 WL 2746570, at *14 n.19 (D. Me. June 7, 2018) (quoting Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 351 (1st Cir. 2018)).

concludes, after a careful review of the record, that there are triable issues as to whether the District, through Potter, Theriault, and Coulombe, retaliated against Plaintiff. Specifically, a reasonable factfinder could conclude that (1) Plaintiff engaged in protected activity within the meaning of the MHRA and the WPA by reporting Potter's conduct to the Board members, individually and at the January 14th Board meeting; (2) Plaintiff had reasonable cause to believe that her treatment by Potter constituted unlawful sex discrimination; (3) she was subjected to adverse action in the retaliation context because the actions taken by Potter and the Board, including Potter's reminders that she was a probationary employee, constituted "threats" against her employment or would have dissuaded a reasonable person from making a charge of discrimination; and (4) there was a causal connection between her protected activity and the adverse action.[43] Regarding the causal connection, the Court concludes that a reasonable factfinder could discern pretext and but-for causation in the manner in which Potter and other Board members increased supervision over Plaintiff's work, took steps to clarify the limits of her benefits and privileges, and repeatedly reminded her of her probationary status after she had complained to the Board members about Potter's behavior.

The Court rejects Defendants' contention that Plaintiff's general MHRA retaliation claim must fail because she did not adequately "tie her complaints about Supervisor Potter to sex until her formal complaint on January 14, 2015." (Joint Motion (ECF No. 67), PageID # 1558.) A reasonable factfinder could determine that Plaintiff was raising a sex discrimination issue when she complained about Potter's "dance naked" comment and other behavior to the individual

---

[43] The Court does not discern any evidence of retaliation after Plaintiff went on leave and is unconvinced by Plaintiff's attempts to reformulate her failure to accommodate and failure to engage in an interactive process claims into retaliation claims.

Supervisors before the January 14th Board meeting.[44]  Further, taking the record in the light most favorable to Plaintiff, a reasonable factfinder could determine that Plaintiff's lawyer made the Board aware that she was bringing a claim of sexual harassment at the *beginning* of the January 14th Board meeting, before Potter repeatedly invoked her probationary status and before the Board members voted on several amendments to the Personnel Policy and took other actions that could be deemed "threatening" in the retaliation context.

The Court also rejects Defendants' contention that Plaintiff did not engage in whistleblowing activity because she was complaining about her own treatment.  The Court is not aware of any relevant precedent that would foreclose a WPA retaliation claim simply on the basis that the employee was reporting an unlawful action or harmful condition regarding the employee herself.  Indeed, the statute clearly protects an employee who reports "what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety *of that employee* or any other individual." 26 M.R.S.A. § 833(1)(B) (emphasis added).  This language suggests that an employee may be engaging in protected whistleblowing activity even when she is reporting a problem directly affecting her.  Furthermore, it is logical that an employee can state separate claims for the separate harms of discrimination and retaliation based on any attempt to complain about that discrimination.  Finally, regarding the potential application of the Faragher/Ellerth affirmative defense to this claim, the Court concludes that there are triable issues of material fact regarding whether the District as Charette's employer took reasonable and prompt action to prevent and correct any retaliation she experienced.

---

[44] Defendants' attempt to analogize this case to Ponte v. Steelcase Inc., 741 F.3d 310 (1st Cir. 2014) and Stinson v. Simplexgrinnell LP, 394 F. Supp. 2d 280 (D. Me. 2005) is unavailing because, taking the record in the light most favorable to Plaintiff, she made clear to the Supervisors that she was complaining about sexual harassment.

The Court, however, sees no triable issue on the retaliation claims regarding the surplus property program. Even assuming that Plaintiff has made out her case that her comments at the November 12, 2014, Board meeting constituted protected activity under the WPA, a reasonable factfinder could not conclude that any subsequent adverse action was taken based on that activity. Simply put, given the stronger case that she was retaliated against based on her claims of sex discrimination, a reasonable factfinder could not conclude that her comments regarding the surplus property program were the "but-for" cause of any subsequent adverse action. Indeed, the record shows that by the December 9, 2014 Board meeting she was no longer objecting to the District's plans in regards to the surplus property program. The only incident that Plaintiff has connected to her comments regarding the surplus property program is the incident with Potter regarding the missing files the day after the November 12th Board meeting. But this incident is not a legally cognizable adverse action even under the less stringent conception of the term in the retaliation context.

*** 

For these reasons, the District is entitled to summary judgment on Count I to the extent it alleges Plaintiff was discriminated against, constructively discharged, and retaliated against based on her comments regarding the surplus property program. However, the District is not entitled to summary judgment on Count I to the extent it alleges that Plaintiff was subject to a hostile work environment based on her sex and retaliated against based on her complaints regarding this treatment.

B.  MHRA and Rehabilitation Act against the District (Counts I and VI)

Plaintiff also contends that the District violated the MHRA and the Rehabilitation Act by (a) failing to provide her with a reasonable accommodation for her disability; and (b) failing to engage, in good faith, in an informal, interactive process with her to determine an appropriate accommodation for her disability.  (Compl., PageID #s 228, 230.)

i.    Failure to Accommodate

Under the Rehabilitation Act and the MHRA, covered employers are required to provide reasonable job accommodations to qualified individuals with disabilities.  29 U.S.C. §§ 794(a), (d); 42 U.S.C. § 12112(a), (b)(5)(A); 5 M.R.S.A. §§ 4553(2)(E), 4572(1)(A), (2).[45]  To succeed on a failure to accommodate claim under these statutes, "a plaintiff must show that: (1) [she] is a [disabled] person within the meaning of the [statutes]; (2) [she] is nonetheless qualified to perform the essential functions of the job (with or without reasonable accommodation); and (3) the employer knew of the disability but declined to reasonably accommodate it upon request." Sepúlveda-Vargas v. Caribbean Restaurants, LLC, 888 F.3d 549, 553 (1st Cir. 2018) (discussing a failure to accommodate claim under the Americans with Disabilities Act).[46]

"Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." Murray v. Warren

---

[45] "[S]ince the same standards apply to both the Rehabilitation Act and [the Americans with Disabilities Act of 1990 (ADA)], [courts] rely on precedent construing both statutes."  Enica v. Principi, 544 F.3d 328, 338 n.11 (1st Cir. 2008); see also 29 U.S.C. § 794(d) ("The standards used to determine whether [the Rehabilitation Act] has been violated . . . shall be the standards applied under [the employment discrimination sections of the ADA].")  The MHRA and the ADA are generally construed coextensively.  See Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 74 (1st Cir. 2010).  The parties do not dispute that the Rehabilitation Act applies to the District based on its receipt of federal funds.  See 29 U.S.C. § 794(a).

[46] Defendants are not challenging Plaintiff's disability or claiming that she provided inadequate notice of her disability to the District.  (See Joint Motion (ECF No. 67), PageID #s 1559-60.)

Pumps, LLC, 821 F.3d 77, 84 (1st Cir. 2016) (citing 29 C.F.R. § 1630.2(o)).  As such, reasonable accommodations "may include job restructuring . . . . However . . . an employer [is not required] to reallocate job duties in order to change the essential function of a job."  Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 20 (1st Cir. 1998) (quotation marks omitted).  Nor is an employer required to provide an accommodation that removes an essential function of the position. Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 81 (1st Cir. 2010).  In general,

> the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis.  In making this case-by-case determination, [courts must] give consideration to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.  And the Equal Employment Opportunity Commission's . . . implementing regulations . . . further tell us that beyond the employer's judgment, things to be considered include (but are not limited to) factors like "[t]he consequences of not requiring the incumbent to perform the function[,]" "[t]he work experience of past incumbents in the job[,]" and "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).  Such considerations are not meant to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth.

Sepúlveda-Vargas, 888 F.3d at 553 (citations and quotation marks omitted).

Once a reasonable accommodation is identified, an employer is required to provide that accommodation unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).  The First Circuit has helpfully elucidated the interplay of burdens as follows:

> In order to prove "reasonable accommodation," a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.  If plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details.

Under this arrangement, the difficulty of providing plaintiff's proposed accommodation will often be relevant both to the reasonableness of the accommodation and to whether it imposes an undue hardship. Plaintiff will often need to take such difficulties into account in proving whether the accommodation is facially practicable, and defendant will of course need to provide evidence of them in attempting to prove undue hardship. Indeed, where the costs of an accommodation are relatively obvious—where they really are what they appear to be on the face of things—plaintiff's burden and defendant's burden may in application be quite similar, even to the extent of being mirror images. Where the burdens will significantly differ is when the costs of an accommodation are not evident on the face of things, but rather are better known to the employer. For example, an employee's proposal that her work area be modified might be facially reasonable, but the employer may still show that, given the particular limitations on its financial resources, or other hidden costs, such accommodation imposes an undue hardship.

Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259-60 (1st Cir. 2001) (footnote and citations omitted).

On this record, no reasonable factfinder could conclude that Plaintiff's proposed accommodation—working thirty-two hours per week as the sole employee of the District while having no contact with the Board—was facially reasonable. First, any reasonable factfinder would conclude that attending Board meetings and communicating directly with the Board is an essential function of the District Coordinator position based on the position description and the testimony of previous District Coordinators regarding their job duties.[47] Plaintiff has not provided anything to meaningfully rebut this evidence. Second, even if a reasonable factfinder could determine that attending Board meetings and communicating directly with the Board is not an essential job function, any reasonable factfinder would conclude that Plaintiff's requested accommodation presented an undue hardship in that she was essentially asking the Board to relieve her of a portion

---

[47] A court "gives a significant degree of deference to an employer's business judgment about the necessities of a job," Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012) (quotation marks omitted), but evidence of discriminatory animus or pretext may undercut this deference, Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000). To give every benefit to Plaintiff as the non-moving party, the Court does not in any way accord deference to the District's contentions, standing alone, about what constitutes an essential job function of the District Coordinator position.

of her job duties without hiring someone else to take on those duties.[48]  Furthermore, to the extent

she was seeking a guarantee that she would have *no contact* with Potter, including at the District

Office, she was essentially asking the District to restrict Potter's activities on the District's behalf

or even to relieve him of his duties.  The Court is unaware of any precedent to suggest that

essentially requesting the ouster of an organization's leader is facially reasonable or does not

present an undue hardship.

    ii.    Failure to Engage in an Interactive Process

    In some circumstances, "it may be necessary for [an employer] to initiate an informal,

interactive process with the individual with a disability in need of the accommodation.  This

process should identify the precise limitations resulting from the disability and potential reasonable

accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3); <u>Tobin v.

Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 108 (1st Cir. 2005).  Generally, if an interactive process is

necessary in a given situation, the employer must in good faith "engage in a meaningful dialogue

with the employee to find the best means of accommodating [the employee's] disability."  <u>Enica

v. Principi</u>, 544 F.3d 328, 338-39 (1st Cir. 2008) (quotation marks omitted).  The duty to engage

in an interactive process "does not mean that the employer has the unreasonable burden of raising

and discussing every conceivable accommodation with the disabled employee."  <u>Tobin</u>, 433 F.3d

at 109.

    An employer's liability for failure to engage in an interactive process depends on finding

(1) that a breakdown in the process has occurred due to a failure to participate in good faith by the

---

[48] There is no evidence in the record that the District had the ability to retain Plaintiff on a thirty-two hour per week
schedule and also hire an additional employee to communicate with the Board.  Even if the District had this ability, it
is far from clear that Plaintiff would have accepted working with an additional employee given her stated concerns
about "sharing" the District Coordinator position.  (<u>See</u> SR 29.)

employer or a failure to make efforts to explore reasonable accommodations, <u>Enica</u>, 544 F.3d at 339, and (2) that the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions if the interactive process had not broken down, <u>Jones v. Nationwide Life Ins. Co.</u>, 696 F.3d 78, 91 (1st Cir. 2012). "[A] party that obstructs or delays the interactive process is not acting in good faith." <u>Enica</u>, 544 F.3d at 339 (quotation marks omitted). The question of *whether an interactive process was required* is moot where the employer in fact engaged in meaningful dialogue with the employee. See <u>Kohl's</u>, 774 F.3d at 132 n.5 ("In this case, we do not need to address whether Kohl's had a duty to engage in an interactive process, since it did in fact initiate such a dialogue with [the employee].")

Even assuming favorably to Plaintiff that a claim for failure to engage in an interactive process is cognizable under the MHRA, <u>see</u> <u>Kezer v. Cent. Maine Med. Ctr.</u>, 40 A.3d 955, 963 (Me. 2012) (suggesting such a claim is *not* cognizable under the MHRA), the Court concludes on this record that there is no basis for such a claim under either the MHRA or the Rehabilitation Act. The District did in fact engage in a dialogue with Plaintiff, through counsel, and there is simply no evidence of a breakdown in the process caused by bad faith or a lack of effort on the District's part.[49] Further, no reasonable factfinder would conclude that a reasonable accommodation satisfactory to Plaintiff would have been found if not for some failure on the District's part to engage in a meaningful dialogue; as discussed in regards to the failure to accommodate claim, <u>see</u> <u>supra</u> pp. 54-55, the record supports that Plaintiff was seeking an accommodation that was not in fact reasonable, or that would have created an undue hardship for the District.

***

---

[49] The cases cited by Plaintiff, <u>Kauffman v. Petersen Health Care VII, LLC</u>, 769 F.3d 958 (7th Cir. 2014) and <u>Goodrich v. WellPoint, Inc.</u>, No. 2:14-CV-37-JDL, 2015 WL 4647907, at *1 (D. Me. Aug. 5, 2015), are entirely inapposite.

For these reasons, the District is entitled to summary judgment on Count I to the extent it alleges failure to accommodate and failure to engage in an interactive process.

C.      Equal Protection against Potter, Theriault, and Coulombe (Counts IX-XI)

Plaintiff also contends, pursuant to 42 U.S.C. § 1983, that Defendants violated her right to Equal Protection by discriminating against her on the basis of her sex, retaliating against her for complaining about the discrimination, and failing to stop others from retaliating against her. (Compl., PageID #s 231-32.)  "When a plaintiff attempts to use § 1983 as a parallel remedy to a Title VII claim, the *prima facie* elements to establish liability are the same under both statutes" Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 192 (1st Cir. 2003), with the additional element that the plaintiff must demonstrate evidence of actual disparate treatment to support an equal protection claim, Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 32 (1st Cir. 2012).

For the reasons explained above, see supra pp. 42-43, Plaintiff has presented a triable issue regarding whether she was subjected to a sex-based hostile work environment.  Further, the Court determines, based on the record, that there are triable issues as to whether she was subject to disparate treatment by Potter.  A reasonable jury could conclude that Tardif was in essentially the same position as Plaintiff but was not subjected to the same treatment by Potter.  However, Plaintiff has simply provided no evidence from which a reasonable jury could conclude that Plaintiff was subject to disparate treatment *by Theriault and Coulombe*.  For these reasons, Theriault and Coulombe are entitled to summary judgment on Plaintiff's Equal Protection claims, but Potter is not so entitled.

D.      First Amendment against Potter, Theriault, and Coulombe (Counts XII-XIV)

Lastly, Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Potter, Theriault, and Coulombe violated her First Amendment rights by "failing to stop the retaliation against Plaintiff for complaining about matters of public concern, and by [themselves] retaliating against Plaintiff for complaining about matters of public concern."  (Compl., PageID # 233.)  "To succeed on [a] § 1983 First Amendment retaliation claim, [a plaintiff] must establish that: (1) [she] was speaking as a citizen on a matter of public concern; (2) [her] interests, as a citizen, in commenting upon matters of public concern outweighed [her] employer's interest in promoting the efficiency of the public services it performs through its employees; and (3) the protected expression was a substantial or motivating factor in the adverse employment decision."  McGunigle v. City of Quincy, 835 F.3d 192, 202 (1st Cir. 2016) (quotation marks omitted).  "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  Connick v. Myers, 461 U.S. 138, 147 (1983).  Whether an employee spoke (a) as a citizen and (b) on a matter of public concern are questions of law.  Foley v. Town of Randolph, 598 F.3d 1, 5 n.7 (1st Cir. 2010).

To determine whether a person spoke "as a citizen," a court must determine whether the speech in question was "'pursuant to [her] official duties'"; "[i]f the answer to this inquiry is in the affirmative, then [she] has no First Amendment claim."  O'Connell v. Marrero-Recio, 724 F.3d 117, 123 (1st Cir. 2013) (quoting Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)).  "In identifying [an employee]'s official responsibilities, the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform, and not merely those formally listed in

the employee's job description."  Decotiis v. Whittemore, 635 F.3d 22, 31 (1st Cir. 2011) (quotation marks omitted).  "Once the employment duties have been identified . . . the [c]ourt must take a hard look at the context of the speech" to determine whether it was made pursuant to those duties.  Id. at 32; see also Lane v. Franks, 134 S. Ct. 2369, 2379 (2014) ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.")  Among the "instructive," non-individually dispositive contextual factors to consider are: "whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment . . . whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech."  Decotiis, 635 F.3d at 32 (citations omitted).

To determine whether an employee's speech was "on a matter of public concern," a court must consider "the content, form, and context of [the speech], as revealed by the whole record." Connick, 461 U.S. at 147-48.  Generally, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  Lane, 134 S. Ct. at 2380 (quotation marks omitted).

Even if a plaintiff has proven the elements of a First Amendment retaliation claim, a defendant may nonetheless be entitled to qualified immunity.  "Qualified immunity shields [a public official] from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  Therefore, to determine whether a defendant is entitled to

qualified immunity, a court must consider whether the constitutional right the defendant allegedly violated was "clearly established" at the time of the violation. Morales v. Chadbourne, 793 F.3d 208, 220 (1st Cir. 2015); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that a court may determine for purposes of qualified immunity whether a constitutional right was "clearly established" without determining if there was in fact a constitutional violation in the specific case before the court). The "clearly established" inquiry involves considering "[1] the clarity of the law at the time of the violation [and] [2] whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013). In other words, a right is "clearly established" if "the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Guadalupe-Báez v. Pesquera, 819 F.3d 509, 517 (1st Cir. 2016) (quotation marks omitted). In the absence of factual disputes, a defendant's entitlement to qualified immunity is a question of law for the court to decide. Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 83 (1st Cir. 2006).

Plaintiff contends that she was retaliated against "for speaking against Potter's plan to misuse government funds to purchase and resell heavy equipment; for reporting to the Supervisors and [Rocque] retaliation by Potter for her refusal to engage in illegal activity; and for reporting to the Supervisors and [Rocque] sexual harassment by Potter."[50] (Pl.'s Response, PageID # 1634.) Regarding the surplus property program comments, the Court concludes, as a matter of law, that Plaintiff was not speaking *as a citizen* because she was speaking pursuant to her official duties. The context of Plaintiff's comments is that (1) her job responsibilities included carrying out tasks

---

[50] The Court does not understand Plaintiff to be making the conceptually distinct claim that she was retaliated against for filing paperwork with the Maine Human Rights Commission, and the facts do not support such a claim.

assigned or approved by the Board of Supervisors; (2) she had been asked to investigate the potential purchase of surplus property by the Board Chair; (3) she initially had willingly undertaken this assignment as part of her job duties; (4) she subsequently voiced resistance to pursuing the assignment further once she believed that it was unlawful; and (5) she voiced this resistance to the Supervisors at a Board meeting. This context demonstrates that in voicing her concerns about the District's participation in the surplus property program, Plaintiff was speaking pursuant to her official duties. Indeed, Plaintiff herself explicitly stated that in refusing to do anything illegal she was saying how she was going to "do [her] job." (SR 127, 649); see McGunigle, 835 F.3d at 202 n.7 (expressing skepticism that a police officer was speaking as a citizen given his statement that by criticizing his employer's practices he was "just doing [his] job").

The Court sees no relevant difference between Plaintiff's speech and the speech at issue in O'Connell v. Marrero-Recio. In O'Connell, the First Circuit considered whether a human resources director of a governmental agency had spoken as a citizen when she repeatedly refused to take certain actions at the behest of her superior and told him that his requests "could not be legally justified and would surely bring upon [them negative legal repercussions]." 724 F.3d at 121 (alteration in original). The Court concluded that

> the "speech" underlying O'Connell's claim was made pursuant to her duties as [the government agency]'s Human Resources Director. According to Count One of her complaint, O'Connell's alleged protected speech consisted exclusively of several instances in which she communicated to [her superiors] her reluctance to undertake personnel-related actions that she deemed either illegal or unethical. In other words, O'Connell's "speech" solely focused on events at her workplace and was made exclusively to fulfill her responsibilities as [the agency]'s Human Resources Director. This type of communication is the quintessential example of speech that owes its existence to a public employee's professional responsibilities and thus is not protected under the First Amendment.

Id. at 123.  Plaintiff's attempt to distinguish O'Connell, on the basis that "there is no suggestion that it was the District Coordinator's job to offer opinions on the legality or propriety of using the District's funds to purchase heavy equipment" (Pl.'s Response, PageID # 1635), is unconvincing.

Regarding Plaintiff's complaints about harassment by Potter, the Court concludes that even assuming Plaintiff has otherwise proven all the elements of a First Amendment retaliation claim, Defendants are entitled to qualified immunity because they did not violate a "clearly established" right.  It is unclear that an employee is engaging in First Amendment protected speech when she complains that *she herself* has been subjected to harassment or discrimination.  Several courts have explicitly held that a person is not speaking "on a matter of public concern" when she complains that she personally has been harassed or discriminated against.  See, e.g., Kubiak v. City of Chicago, 810 F.3d 476, 482-83 (7th Cir. 2016); Brooks v. Arthur, 685 F.3d 367, 372 (4th Cir. 2012) (distinguishing between complaints by an employee that he is being discriminated against and complaints of broader "discriminatory institutional policies or practices"); Holbrook v. City of Alpharetta, 112 F.3d 1522, 1530 (11th Cir. 1997); Saulpaugh v. Munro Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993); see also Gross v. Town of Cicero, Ill., 619 F.3d 697, 706 (7th Cir. 2010) ("[p]urely personal grievances" regarding sexual harassment of plaintiff's daughter did not count as speech on a matter of public concern).[51]  These decisions are consistent with the general proposition that "[s]peech 'calculated to redress personal grievances' will not support a first amendment retaliation claim."  Gardner v. Thomas, No. 1:13-CV-331-GZS, 2014 WL 916397, at *9 (D. Me. Mar. 10, 2014) (quoting Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008)).

---

[51] The Court notes that Johnson v. Louisiana, 369 F.3d 826 (5th Cir. 2004), abrogated by Sims v. City of Madisonville, 894 F.3d 632 (5th Cir. 2018), which Plaintiff cites, is inapposite to the extent it remains good law because the plaintiff in that case was complaining about sexual harassment *of a co-worker.*

The First Circuit has not definitively opined on whether or not an employee's complaints that she is being harassed or discriminated against can form the basis of a First Amendment retaliation claim. In Tang v. State of Rhode Island, Department of Elderly Affairs, the Circuit held that an employee's complaints about harassment and retaliation were "individual personal complaints about working conditions" that did not support a First Amendment claim. 163 F.3d 7, 12 (1st Cir. 1998). However, at least one court in this District has read Tang to suggest that the claims of discrimination and harassment in that case did not constitute speech on a matter of public concern because the plaintiff did not explicitly connect the harassment to her sex or race. See Cannell v. Corizon, LLC, No. 1:14-CV-405-NT, 2015 WL 8664209, at *9 (D. Me. Dec. 11, 2015) (describing Tang as holding that "complaints employee made about working conditions—e.g., relocation of workspace and a filing cabinet—which were not alleged to be based on race or [sex] did not constitute a matter of public concern").

Further, courts in this District have come to differing conclusions regarding whether an employee is speaking on a matter of public concern when she complains that she is being sexually harassed or discriminated against. See Roy v. Correct Care Sols., LLC, No. 1:16-CV-383-JDL, 2018 WL 2947107, at *10 (D. Me. Mar. 30, 2018) (concluding that the plaintiff's "speech concerning her own personal interest is not a matter of public concern" where the plaintiff's complaints had included allegations of sexual harassment); Denning v. Povich, No. 04-04-B-H, 2004 WL 1529285, at *3 (D. Me. May 31, 2004) ("The First Circuit has not determined whether an employee's allegations of sexual harassment against that employee alone constitute a matter of public concern. I find persuasive on this issue the opinions of the circuit courts that have held that such allegations do not."); but see King v. Maine Dep't of Corr., No. 1:13-CV-163-JDL, 2015 WL 2092526, at *5 (D. Me. May 5, 2015) (suggesting, on a motion to dismiss, that the plaintiff engaged

in speech on a matter of public concern when she accused her supervisor of discriminating against her because she is a lesbian).[52]

Given this muddy legal landscape, it is not "clearly established" that Plaintiff was speaking on a matter of public concern when she complained that she was being subjected to harassment and discrimination. Defendants, therefore, are entitled to qualified immunity and the Court grants summary judgment in their favor on Counts XII-XIV.[53]


## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES the Joint Motion for Summary Judgment (ECF No. 67) as to the District to the extent Plaintiff claims she was subjected to a hostile work environment and retaliated against for complaining about her treatment but otherwise GRANTS

---

[52] The Court notes that the Circuit's unpublished decision in <u>Burrell v. Board of Trustees for the University of Maine System</u>, 15 Fed. App'x 5 (1st Cir. 2001), does not provide further clarity on this issue. In <u>Burrell</u>, the Court in dicta cites to <u>Connick v. Myers</u> for the proposition that complaints by an employee that he was racially discriminated against "inherently addresses a matter of public concern." 15 Fed. App'x at 7. <u>Connick</u>, however, does not necessarily support this broad proposition. The <u>Burrell</u> court cites to the Supreme Court's statement that an employee's "right to protest racial discrimination [is] a matter inherently of public concern." <u>Connick</u>, 461 U.S. at 148 n.8. But the Supreme Court there cites an earlier case, <u>Givhan v. Western Line Consolidated School District</u>, 439 U.S. 410 (1979), which involved a teacher's speech expressing "concern as to the impressions on black students of the respective roles of whites and blacks in the school environment" rather than speech claiming that the teacher was herself being subjected to racial discrimination, <u>see</u> <u>Ayers v. W. Line Consol. Sch. Dist.</u>, 555 F.2d 1309, 1313 (5th Cir. 1977), <u>vacated in part sub nom.</u> <u>Givhan v. W. Line Consol. Sch. Dist.</u> (describing the nature of the teacher's speech at issue).

[53] Plaintiff argues via footnote that her "claims for injunctive relief would remain" despite the Court's grant of summary judgment on the basis of qualified immunity. (Pl.'s Response (ECF No. 69) at 35 n.18, PageID # 1641.) However, even viewing the record in the light most favorable to Plaintiff, she has not presented facts that would satisfy the four-factor test for such injunctive relief. <u>See, e.g.</u>, <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006). On the current record, the Court cannot discern how Plaintiff would be entitled to the specific injunctive relief she seeks against the individual Defendants if she were to prevail on her First Amendment claims. Plaintiff's prayer for reinstatement, for example, is appropriately addressed to the District, and Plaintiff still may be entitled to this relief if she prevails on her claims against the District. Plaintiff's passing suggestion that she would need injunctive relief for the individual Defendants to "cease their unlawful conduct" appears to reflect only her subjective fear that the individual Defendants would not comply with any judgment rendered in Plaintiff's favor. <u>See</u> <u>Asociación De Periodistas De Puerto Rico v. Mueller</u>, 680 F.3d 70, 85 (1st Cir. 2012) (explaining that "subjective fears" and assertions of "past harm" are "generic, speculative, and fail to demonstrate a real and immediate threat of likely future violations" as required to support the need for injunctive relief) (quotation marks omitted).

the Motion.  The Court DENIES Defendant Potter's Motion for Summary Judgment (ECF No. 68) as to Plaintiff's Equal Protection claim but GRANTS the Motion as to Plaintiff's First Amendment claim.  In light of these rulings, this matter shall proceed as to the District on Count I and as to Potter on Count IX.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 17th day of August, 2018.